Laura RENDA, Plaintiff,

v.

ADAM MELDRUM & ANDERSON COMPANY, Adam Meldrum & Anderson Company Pension Plan, Defendants.

No. 89–CV–553S.

United States District Court,
W.D. New York.

Nov. 12, 1992.

James P. Renda, Renda, Pares & Pfalzgraf, Buffalo, N.Y., for plaintiff.

Thomas S. Gill, Saperston & Day, Buffalo, N.Y., for defendants.

## DECISION AND ORDER

SKRETNY, District Judge.

Defendants move for summary judgment, and plaintiff cross moves for summary judgment, pursuant to Fed.R.Civ.P. 56(b).

In a single count Amended Complaint ("Am.Complaint"), plaintiff seeks payment of pension plan benefits allegedly owed to her, plus attorney's fees and costs.

This Court has jurisdiction based on ERISA, 29 U.S.C. § 1132(e).

Both parties contend that no material issue of fact exists and that each is entitled to judgment as a matter of law. Plaintiff Laura Renda ("Renda") alleges that she is an employee of defendant store Adam, Meldrum & Anderson ("AM & A") as defined by ERISA and by traditional agency principles, and that as such she is entitled to payment of benefits accrued under the Pension Plan covering AM & A employees.

Defendants AM & A and the AM & A Pension Plan (the "plan") counter that plaintiff does not qualify as an employee under either ERISA or at common law

inasmuch as she worked for a lease department rather than for AM & A itself, and there is no showing that plaintiff was defrauded of any right to benefits.

In support of their motion for summary judgment, defendants submit an Affidavit of Robert B. Adam with exhibits, sworn to on June 28, 1989 ("Adam aff."), an Affidavit of James M. Rollo, with exhibits, sworn to on January 22, 1990 ("Rollo aff."), a Memorandum of Law dated January 25, 1990 ("def. memo"), a Statement of Material Facts dated January 5, 1990 ("def. fact statement"), and a Reply Memorandum of Law dated March 28, 1990 ("def. reply memo").

In support of her cross motion for summary judgment, plaintiff submits Renda's deposition, sworn to June 20, 1989 ("Renda dep."), the Affidavit of Laura Renda, sworn to on March 13, 1990 ("Renda aff."), the Supporting Affidavit of Paul T. Bumbalo, Esq., with exhibits, sworn to on March 13, 1990 ("Bumbalo aff."), a Memorandum of Law, not dated ("pl. memo"), and a Statement of Material Facts, dated March 13, 1990 ("pl. fact statement"). On May 1, 1991, the Hon. Richard A. Arcara, United States District Court Judge for the Western District of New York, transferred the case to this Court. Both parties presented oral argument on August 8, 1991.

In ruling, this Court has considered all the aforementioned submissions by the parties, as well as their oral arguments.

For the reasons articulated below, this Court hereby DENIES defendants' motion for summary judgment, and GRANTS plaintiff's cross motion for summary judgment.

## FACTS

On January 30, 1951, AM & A entered into a "Lease and Agreement" ("lease") with Max Tegler, ("Tegler"), now deceased, to let space to Tegler in the Main Street AM & A store, to be used as a jewelry sales department and repair area. (Adam aff., ex. A). The lease contained various provisions relating to the oversight of the jewelry department and employees working in that department, and provided for a rental fee based on the gross sales of the department. (Adam aff., 1951 lease, ¶ 4).[1]

---

1. Paragraph 4 of the 1970 lease, the most recent rental provision, reads:

"The LESSEE shall pay to the LESSOR for the period beginning August 1st, 1970, fixed rent at the annual rate of SEVENTY–FIVE THOUSAND DOLLARS ($75,000.00) in equal monthly installments of one-twelfth (1/12) of the annual rate on the day of each month for the preceding month of said term and a percentage rate at the rate of fifteen percent (15%) of the annual gross sales less return sales) in excess of Five Hundred Thousand Dollars, ($500,000.00) per lease year and at that rate for any portion of a lease year, arising from the operation of the departments in the various stores above mentioned ... Gross sales shall be deemed to include receipts from labor performed and all sales except amounts received for federal, state and local taxes. In addition to the foregoing fixed and rental percentages, it is understood that on any single unit sales, or of any article sold for a sale price of $1000.00 or more, the LESSEE will pay the LESSOR fifty percent (50%) of the gross profit thereof and will submit to the LESSOR proof of cost and mark-up of any such transaction or transactions." (Adam aff., 1951 lease, ¶ 4).

In addition, all three AM & A/Tegler leases contained the following provisions:

"The LESSEE shall purchase and pay for his own merchandise in his own name and on his own responsibility and account; and shall employ and pay the wages and salaries of his personnel in the said departments, and also pay for the merchandise sold or consumed therein, and for the advertising as hereinafter provided for." (Adam aff., 1951 Lease, ¶ 6; 1970 Lease, ¶ 7).

"All persons employed in said departments shall be engaged by the LESSEE and shall for all purposes be deemed his employees. The salaries of said persons shall be fixed by the LESSEE and shall solely as a convenience be paid out by the LESSOR for the account of the LESSEE from the funds held for his account". (Adam aff., 1951 Lease, ¶ 8).

"The LESSEE will not establish any rules and regulations in connection with the business to be conducted by him and to be adhered to by his employees which in any way conflicts with the rules and regulations now established or in force in the LESSOR'S store; and whatsoever further or different rules the LESSOR may from time to time establish ... It shall be the obligation of the LESSEE to enforce the said rules and regulations and enforce adequate discipline over his employees while on the premises of the LESSOR, and to so manage that his employees do not interfere with the employees nor the business of the LESSOR, and to conduct themselves in a manner consistent with the conduct of the employees of the LESSOR and with the

Receipts from the jewelry department were turned over to the store and credited to the department. (Adam aff., 1951 Lease, ¶ 5; Bumbalo aff., ¶ 3). The lease was amended three times between 1956 and 1986, however most of the relevant provisions of the lease remained the same.[2] The total lease period ran from January 30, 1951 to January 1, 1986. (Rollo aff., ¶ 4).

In 1955, Renda contacted the AM & A Personnel Department and applied for a position in the jewelry department. (Renda aff., ¶ 2). She was first required to meet with Max Tegler at the AM & A University Plaza Store. (Renda dep., p. 12; Renda aff., ¶ 2). Following this interview, she met with Eugene Schaefer, AM & A's Personnel Manager. She was then instructed to fill out an employment application from the AM & A Personnel Department and to attend an orientation program covering the rules and procedures for employees of AM & A. She was hired to work in the jewelry department on April 26, 1955. (Renda aff., ¶ 2). The jewelry department employees were compensated through the AM & A payroll system from the time that Renda was hired until May 18, 1983, when checks began to be issued from Tegler's account. (Renda aff., ¶¶ 6, 7; Exs. D, E). Renda's 1960 Withholding Statement lists AM & A as the employer paying her wage. (Renda aff., Ex. C). Tegler was responsible for preparing the work schedules and computing payroll hours of jewelry department employees, and plaintiff testified that "he was in charge" and "was the boss and we all catered like everybody else would do." (Renda dep., p. 34, lines 11–20).

During her time at the jewelry department, Renda was subject to the AM & A dress code in effect at the store, including wearing AM & A name tags. (Renda aff., ¶ 6). During Renda's tenure as an employee, she received various tokens of acknowledgement from AM & A, such as receipt of an AM & A watch on her 25th anniversary, and inclusion of her name in the list of long time employees of AM & A in the Buffalo

business and reputation of the *LESSOR*." (Adam aff., 1951 Lease, ¶ 9).

"The *LESSEE* agrees to carry Workmen's Compensation coverage under the laws of the State of New York, and coverage under the New York State Disability Benefits Law, upon his employees in the department operated by him in the store of the *LESSOR*, and to pay all premiums and liability incurred thereunder. The *LESSEE* agrees to indemnify and save the *LESSOR* harmless from all claims, liability, damage, cost and expense arising from the conduct of said department by the *LESSEE* * * * The *LESSEE* agrees to accept exclusive liability for the payment of any Federal, State, City, Town or County payroll taxes or contributions for unemployment insurance which are measured by the wages, salaries or other renumerations paid to the employees of the *LESSEE* * * * The *LESSEE* may adopt such arrangements as he desires with regard to the details of the work, his personnel, and the hours during which the work is performed, provided such arrangements will be consistent with store hours and the achievement of the purposes of this agreement." (Adam aff., 1951 Lease, ¶ 12).

"The *LESSEE* agrees that all disputes arising in connection with the conduct of said department shall be finally decided by the *LESSOR*, and that he will gracefully accept such decision as final." (Adam aff., 1951 Lease, ¶ 13).

2. In 1956, the lease was amended to include a non-compete clause (Adam aff., 1956 Lease, ¶ 2), and again in 1963 to modify the rental amount and to afford AM & A additional rights concerning the department's advertisements. (Adam aff., 1963 Lease, ¶¶ 4, 11). The Amended Lease of 1970 gives AM & A the following power over the jewelry department staff:

"LESSEE shall not employ, nor continue in his employment in the various leased premises any person who is objectionable for any reason to LESSOR and upon written or verbal notice to LESSEE, LESSEE agrees to terminate promptly the employment of any such objectionable person and to discharge and remove such employee. LESSEE agrees to require each prospective employee, prior to hiring, when deemed necessary by the LESSOR, to submit to a physical examination by a physician approved by the LESSOR, and not to hire any person who is reported by said physician to be unfit or unsuited for such employment because of disease or sickness or any other physical or mental deficiency or disability; LESSEE further agrees to have similar periodic examinations of all his employees by such physician when deemed necessary by LESSOR, and to promptly discharge any employee reported at any time by said physician to be unfit or unsuited for such employment because of disease or sickness or any other physical or mental deficiency or disability. Such periodic examination of employees shall not be required more often than once every six months. All such physical examinations shall be without expense to LESSOR." (Adam aff., 1970 Lease, ¶ 8).

News, the local newspaper. (Renda aff., ¶ 9). Renda testified that all employee dismissals in the jewelry department were commonly handled "from upstairs," that is, by the AM & A supervisors rather than by Tegler. (Renda dep., p. 77, line 18; Renda aff., ¶ 11).

AM & A gave its leased departments the option of adopting either or both of the AM & A Life and Health Insurance Plans. The option was specifically offered to Tegler as lessee of the jewelry department, who accepted it on behalf of the lease department and the employees working there. (Adam aff., ¶ 8).

On January 1, 1976, AM & A established the AM & A Pension Plan, and distributed a summary plan description to its employees. (Adam aff., ¶ 9). The plan provided that an "associated employer had the option of adopting the plan on behalf of employees working in that associated employer's department." (Rollo aff., Ex. A).[3] At the time the plan was adopted, Robert Adam, Chairman of the Board and Chief Executive Officer of AM & A, offered Tegler the option of participating in the plan on behalf of his employees, pursuant to § 2.04 of the plan document. (Adam aff., ¶¶ 10, 11; Rollo aff., Ex. A). In a conversation with Tegler, Adam alleges that Tegler refused to participate in the plan. (Adam aff., ¶ 12). It is undisputed that Renda never received a summary plan description while employed in the jewelry department, nor was she notified that she was a participant. (def. fact statement, ¶ 6; pl. fact statement, ¶ 6). It is also undisputed that no one else in the jewelry department ever received a summary plan description or any benefits under the plan. (def. memo, pp. 1, 2).

Renda retired from her position on or about January 25, 1986, and thereafter filed this suit on May 8, 1989. (Renda aff., ¶¶ 4, 7; Rollo aff., Ex. C). Since then, the AM & A Retirement Committee has reviewed Renda's claim, and has determined that she is not entitled to any benefits under the plan. (Rollo aff., Ex. C).

## DISCUSSION

Statements made during oral argument as well as the absence of any supporting or opposing papers from either plaintiff or defendant concerning the issue of age discrimination indicate that plaintiff's age discrimination claim set out in the Amended Complaint (Am.Complaint, ¶ VI) has been withdrawn. Therefore, this Court deems that claim withdrawn.

Plaintiff argues that her tenure with the lease department of AM & A was sufficient to qualify her for participation in and eligibility under the plan, and that she has not received either pension benefits or insurance conversion rights from the plan. (Am.Complaint, ¶¶ 6–8). She asserts that ERISA §§ 3(5) and 3(14)(E)(ii), 29 U.S.C. §§ 1002(5), and 1002(14)(E)(ii), respectively,

---

**3.** The AM & A Pension Plan Working Copy (dated January 1, 1984) contains the following relevant sections:
 "SECTION 1.01 THE PLAN AND PARTIES CONCERNED
 (a) 'Employer' means Adam, Meldrum & Anderson Co., Inc. and any successor by change of name or merger or any successor corporation which may adopt and assume the Plan.
 "SECTION 2.04 ASSOCIATED EMPLOYERS
 Associated Employer means the Employer or any one of the Employer's subsidiary or affiliated corporations or other firms which, by written agreement with the Employer, at any time adopts this Plan for the benefit of its employees.
 In interpreting the provisions of this Plan as to an Associated Employer, this Plan will be deemed a separate and distinct Plan for the exclusive benefit of its employees. For such purpose, and where and as appropriate, each Associated Employer will thereby be deemed the Employer hereunder, but only as to those Participants who are on its payroll and in each case only to the extent of the compensation which it pays to these Participants.
 * * * * * *
 Each such Associated Employer not a subsidiary or affiliate of the Employer which adopts this Plan as hereinabove permitted shall be the Named Fiduciary under the Plan as it relates to such Associated Employer. Neither the Employer herein, nor any Participant, Trustee, Administrator or retirement committee of the Employer, nor any other fiduciary with respect to this Plan shall be deemed to be an employer, employee, trustee, administrator or retirement committee with respect to such Associated Employer, or any employee of such Associated Employer or any participant in the Plan as adopted by such Associated Employer." (Rollo aff., Ex. A, § 2.04).

which define certain employment relationship terms, include within their scope the relationship between plaintiff and defendant AM & A. (pl. memo, p. 6). Additionally, plaintiff seeks to demonstrate that AM & A possessed the powers of selection and engagement of plaintiff, control over wages, dismissal, and the power to control plaintiff's conduct sufficient to warrant a finding that AM & A was her actual employer under the common law definition of the term. (pl. memo, pp. 4–6). As a result, she asserts that, during the time in which she worked for the jewelry department located in AM & A, she was an employee of AM & A and as such should have been allowed to participate in the plan, and that denial of participation was the result of a breach of a fiduciary duty owed to her on the part of the defendants. (Am.Complaint, ¶¶ VI, XI; pl. memo, pp. 4, 8).

Plaintiff also refers to sections of the Internal Revenue Code ("IRC"), 26 U.S.C. § 414(n)(1) (incorrectly cited by plaintiff as "§ 414(V)(2)"), which describes benefit contributions for leased employees, and § 414(n)(2) (incorrectly cited by plaintiff as "§ 414(N)(2)"), which defines "leased employee" for purposes of the section, to conclude that employees of the jewelry department are employees of AM & A. These provisions are alleged to provide further support for the proposition that the services performed by her for the jewelry department entitle her to be considered an employee of AM & A. (pl. memo, pp. 9–10).

Plaintiff supplements her position by referring to IRC 26 U.S.C. § 410(b) and accompanying Reg. § 1.410(b)–4(c)(3), which describe minimum coverage and nondiscrimination requirements for qualified pension plans. The substance of the argument is that since AM & A and the plan have not articulated a business reason for their exclusion of leased employees from the plan, it may be inferred that the motive is to reduce costs to AM & A of providing pension benefits. This motive is not a valid business reason under Reg. § 1.410(b)(4)(c)(3)(iii)(A), according to plaintiff, causing defendant's plan to fail the non-discriminatory classification test set forth in that section. (pl. memo, pp. 8, 9).[4]

Finally, plaintiff asserts that Tegler's alleged communication with Adam in which he rejected inclusion of jewelry department employees into the plan constitutes uncorroborated hearsay and as such is non-admissible. (pl. memo, pp. 7, 8).

Defendants contend that Renda was not an employee of AM & A but rather of Tegler, the operator and lessee of the jewelry department, and as such is not entitled to any benefits under the plan. (def. memo, pp. 4, 5). They assert that Tegler had ultimate control over Renda's employment, and that AM & A's right to terminate her as an employee merely amounted to "the right of any customer to insist that he not be provided services by any objectionable employee." (def. memo, p. 2). Defendants argue that the lease arrangement of calculating rent based on gross sales in no way disturbs this concept as it is typical of lease practice. (*Id.*).

In the alternative, defendants point out that even if Renda were determined to be a common law employee of AM & A, or a joint employee of both AM & A and Tegler, § 2.01 of the plan states that an associated employer, like Tegler, must choose to include employees of his department in the plan in order for those individuals to participate and become eligible for plan benefits; otherwise they are specifically excluded. (Rollo aff., Ex. A; Plan § 2.04; def. memo, pp. 3–5). Thus, defendants conclude that since Tegler rejected the plan for his employees, they were excluded from the plan. (def. memo, p. 5).

In addition, defendants respond to alleged violations of the IRC and accompanying regulations by asserting that Renda was not a leased employee of AM & A's, since she did not perform services for AM & A, but for Tegler. Defendants attach significance to the fact that Renda testified that she "took orders from Tegler and no

---

**4.** Plaintiff also inaccurately cites to IRC § 410(b)(9) for the definition of the term "employee" which supplements this regulation, however, it is evident that the definition is actually to be found at 26 C.F.R. § 1.410(b)(9). (pl. memo, p. 9).

one else" to support the conclusion that she does not fall within the scope of § 414(n)(2). (def. reply memo, p. 4).

Defendants urge this Court to conclude that the anti-discrimination provisions contained in § 410(b) and accompanying Treasury Regulations are useful only in determining whether a minimum percentage of employees is covered under a qualified plan. They state that these regulations do not require that leased employees be included in the plan, but only that they be counted for the purposes of establishing correct percentage figures. Their assertion, in essence, is that the regulations merely prohibit an employer from using a lease organization to hide employees in a separate entity and thereby avoid counting them for purposes of non-discrimination classification requirements.

In any event, they insist that those provisions do not require that a leased employee be covered under a plan, regardless of whether that individual is ultimately determined to be an employee of the lessor. The minimum coverage requirements, they insist, are inapplicable. (*Id.*).

Defendants also argue that the decision of the AM & A Retirement Committee rejecting Renda's claim for benefits should be upheld since it was not arbitrary and capricious or unsupported by substantial evidence. (def. memo, p. 5).

Defendants stress that any allegations of fraud made by plaintiff against it cannot stand since no representations were made by AM & A to Renda regarding the plan. (def. memo, p. 7).

Finally, Adam's testimony as to Tegler's rejection of the plan is not hearsay, according to defendants, as it is not offered to prove the truth of the matter asserted, but rather as a verbal act by Tegler. (def. memo, p. 3).

## I. *Summary Judgment*

A grant of summary judgment, pursuant to Fed.R.Civ.P. 56(c), is mandated where the moving party demonstrates "that there is no genuine issue as to any material fact and is entitled to judgment as a matter of law." A grant of summary judgment is appropriate only where the Court, looking to the facts in the light most favorable to the non-moving party, finds that reasonable minds could not differ as to the correct interpretation of the facts. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991) (*citing Anderson v. Liberty Lobby,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## II. *Employee Status*

The first question to be resolved in this case, and the one which the parties have devoted the bulk of their energies to answering, concerns whether Renda is an employee of AM & A.

### 1. Law

The definition of employee under ERISA provides little guidance in determining who should be included within its scope. Fortunately, the question of whether an employment relationship exists between two parties under ERISA was recently addressed by the Supreme Court in *Nationwide Mut. Ins. Company v. Darden,* —— U.S. ——, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). The Court there recognized that "ERISA's nominal definition of 'employee' as 'any individual employed by an employer,' 29 U.S.C. § 1002(6), is completely circular and explains nothing ... [nor is there] any provision ... giving specific guidance on the term's meaning[.]" *Nationwide,* —— U.S. at ——, 112 S.Ct. at 1348. Therefore, the Supreme Court held that where Congress has failed to supply a specific meaning to the term "employee," it is necessary to refer to the common-law agency doctrine.

The common-law test for identifying an employee under ERISA involves determining the "hiring party's right to control the manner and means by which the product is accomplished," including "the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to

the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." *Nationwide*, —— U.S. at ——, 112 S.Ct. at 1348 (*citing Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 751–752, 109 S.Ct. 2166, 2178–2179, 104 L.Ed.2d 811 (1989)).

■ Internal Revenue Code 26 U.S.C. § 414 ("Definitions and special rules"), supplies additional guidance regarding the definition of "employee" and its construction with regards to lease departments:

§ 414 Definitions and special rules ...
"(n) Employee leasing.—

(1) In General.—For purposes of the requirements listed in paragraph (3), with respect to any person (hereinafter in this subsection referred to as the "recipient") for whom a leased employee performs services—
(A) the leased employee shall be treated as an employee of the recipient....

(2) Leased employee—For purposes of paragraph (1), the term "leased employee" means any person who is not an employee of the recipient and who provides services to the recipient if—
(A) such services are provided pursuant to an agreement between the recipient and any other person (in this subsection referred to as the "leasing organization"),
(B) such person has performed such services for the recipient (or for the recipient and related persons) on a substantially full-time basis for a period of at least 1 year, and
(C) such services are of a type historically performed, in the business field of the recipient, by employees.

(3) Requirements.—For purposes of this subsection, the requirements listed in this paragraph are ... (B) sections 408(k), 410, 411, 415, and 416 ..."

The gist of these sections, taken together, is that individuals who perform services 1) pursuant to an agreement between the recipient and a leasing organization, 2) on a full-time basis for at least one year, and 3) of a type historically performed by employees for the recipient of those services in that business field, are to be considered employees of the recipient of those services. The question of whether the leased employee provides services for the leasing organization may be answered by looking to the same criteria used to define a common-law employee.

Section 414 is significant not only because tax treatment of the hired party is a factor in identifying a common-law employee under *Nationwide*, but also because an individual who does not merit employee status may still be considered an employee for purposes of certain sections of the IRC, and by reference, related ERISA provisions, under its scope.[5] It is intended to provide guidance in the application of various treasury regulations to the minimum participation, vesting and funding requirements of both the IRC and ERISA. 29 U.S.C. § 1202(c) states "Regulations prescribed by the Secretary of the Treasury under sections 410(a), 411, and 412 of Title 26 (relating to minimum participation, vesting and funding standards, respectively) shall also apply to the minimum participation, vesting and funding standards set forth in parts 2 and 3 of subtitle B of subchapter I of this chapter [including 29 U.S.C. §§ 1051—1086]." In addition, 29 C.F.R. § 2530.200(a)–2 explains:

"Regulations prescribed by the Secretary of Treasury or his delegate under sections 410 and 411 of the Code (relating to minimum standards for partic-

---

5. 26 U.S.C. § 414(*o*) demonstrates that the Treasury Department recognized the potential for discrimination against certain classes of employees. § 414(*o*) states "The Secretary shall prescribe such regulations ... as may be necessary to prevent the avoidance of any employee benefit requirement listed in subsection (m)(4) or (n)(3) [of § 414] or any requirement under [§] 457 through the use of ... (2) employee leasing". This section seems to indicate that Congress recognized the potential for abuse by employers, who could attempt to avoid the pension plan requirements of Title 26 by using lease arrangements.

ipation and vesting) shall apply for purposes of sections 202 through 204 of the Act [29 U.S.C. §§ 1052—1054]. Thus, except for those provisions (such as the definition of an hour of service or a year of service) for which authority to prescribe regulations is specifically delegated to the Secretary of Labor, regulations prescribed by the Secretary of Treasury shall also be used to implement the related provisions contained in the Act."

Reorganization Plan No. 4 of 1978, 43 F.R. 47713, 92 Stat. 3790, § 101 provides that the authority of the Secretary of Labor to issue regulations regarding various provisions of ERISA, including § 1052(a) was transferred to the Secretary of Treasury. That plan was put into effect on December 31, 1978. *See* Exec. Order No. 12,108, 44 F.R. 1065 (December 28, 1978).

The result is that the identification and treatment of leased employees for purposes of this case is governed by the common-law definition of an employee and the definition provided by § 414(n) of Title 26, United States Code.

2. Discussion

■ Analysis of these factors leads inevitably to the conclusion that plaintiff was a common-law employee of AM & A.

It is apparent from the decisions in *Nationwide* and supporting case law regarding the common-law agency definition of employee that defendant AM & A exercised a substantial amount of control over plaintiff. The rules, regulations, and policies applicable to employees of AM & A and established by the AM & A Personnel Department were also mandatory upon jewelry department employees pursuant to the clause requiring such compliance in the lease, and common practice in the store. These rules influenced plaintiff's employment on a daily basis. She was required to adhere to the AM & A dress code and wear the department store's logo on her name tag. She was given an AM & A watch on the 25th anniversary of her employment with the jewelry department. Her name was included in a list of long time AM & A employees in the local newspaper. While Tegler was given the freedom to "adopt arrangements" regarding details of the work, his personnel, and scheduling of hours under the lease, such arrangements were allowed only with the understanding that they be consistent with AM & A rules and regulations. AM & A also reserved the right to finally decide any dispute which arose between Tegler and the store. Such details amount to "control over the manner and means by which the product is accomplished." ·*Nationwide*, —— U.S. at ——, 112 S.Ct. at 1348.

The "instrumentalities and tools" of the work which plaintiff performed were provided by both defendant AM & A and Tegler. Whereas Tegler provided the actual items which were sold in the department, AM & A contributed everything necessary for the retail sale of those items, presumably a familiar arrangement regarding most items which a department store sells. Services plaintiff performed for AM & A all took place within the department store itself, within the space which AM & A required Tegler to use solely for the sale and repair of jewelry and related items.

Regarding the duration of the relationship between the parties, plaintiff's term as an employee of the jewelry department lasted roughly 30 years, and was at the pleasure of the department store. She was hired to work for AM & A only after speaking with both Eugene Shaffer of the AM & A Personnel Department and Tegler. Renda's deposition testimony indicates that it was common knowledge among employees in the jewelry department that hiring and firing was done "from upstairs" that is, the AM & A Personnel Department, and she never saw anyone fired by Tegler from the floor. AM & A maintained, through its 1970 lease with Tegler, the right to discharge any jewelry department employee at its discretion. AM & A even went so far as to include a provision in the 1970 lease with Tegler which allowed it to require jewelry department employees to undergo medical examinations, which would be administered by physicians chosen by AM & A.

While Tegler was responsible for preparing work schedules and computing payroll hours for the jewelry department personnel, his authority was more akin to the position of manager rather than employer. This Court agrees with plaintiff's assertion that "Max Tegler was merely a figurehead of the Jewelry Department, [and] that Adam, Meldrum & Anderson controlled all operations of the department except for the day-to-day dealings with the retail customers." (Bumbalo aff. ¶ 11). Although Tegler was technically responsible for payment of wages of the jewelry department personnel under the terms of the lease arrangement, this clause also provided that such payments were to be generated from Tegler's own account, which was not in fact the practice of the parties until May of 1983, as evidenced by plaintiff's payroll stubs and tax withholding statements issued from the AM & A Payroll Checking Account prior to 1983, and the store's practice of reporting employees of the jewelry department for income tax purposes. (Renda aff. ¶¶ 6, 7; Exs. C, D, & E). Defendant admitted in its memorandum of law that plaintiff was compensated through the AM & A payroll system.

The tax treatment of plaintiff by the department store is governed in part by § 414, which in turn is applicable to determining participation requirements. IRC § 414, specifically directed to the identification of leased employees, demonstrates that such individuals must be accorded full employee status for purposes of determining their rights under the specified sections. Defendants over extend themselves in asserting that plaintiff is not covered by this definition of leased employee, having referred to her as such in their own papers. Their position that plaintiff did not provide services for the department store is undercut by the extent of their control over her (described *supra*), and also by the fact that services performed for the benefit of both

Tegler and AM & A would also qualify her as an employee of AM & A, since Tegler would be a "related person" under § 414(n)(2)(B). Since she 1) provided services pursuant to an agreement between Tegler and AM & A, 2) worked full time for over one year, and 3) performed services in the jewelry department which presumably are generally performed in a retail setting by employees of the retailer, a plausible argument can be made that she fits the criteria listed within that section.

Notably, both § 414(n)(2) and the factors distinguishing a common-law employee reference the importance of assessing whether the services performed are in the traditional business area of the hiring party. This Court notes that plaintiff's position as a salesperson in the jewelry department, as opposed to an in-store bakery counter person or an in-store career center instructor, lends added credence to the argument that she was an employee of AM & A.

Despite various lease provisions to the contrary, and the supervisory functions of Tegler notwithstanding, AM & A's relationship to the plaintiff makes her a common-law employee of the defendant.[6]

### III. *AM & A's Duty to Renda*

1. Law

Plaintiff may not rely solely on the argument that she was an employee of AM & A to defeat defendants' motion for summary judgment, much less to convince this Court that summary judgment is warranted in her favor. Plaintiff must also demonstrate that she was entitled to receive some kind of notice or consideration from her employer with regard to the plan.

Plaintiff argues in essence that AM & A had a duty to include her as a participant in the plan, relying on 26 U.S.C. § 410(b) Minimum Participation Requirements, and Treasury Regulation § 1.410(b)–(4)(c)(3)

---

**6.** Plaintiff's assertion that the language of ERISA §§ 1002(5), 1002(6), and 1002(14) (which define the terms "employer", "employee" and "party in interest") taken together, can be read as including the type of relationship presently at issue is ultimately unpersuasive. While the definition of an employer might arguably be read to include a "party in interest", the 50% or more capital or profit interest alleged to be held by AM & A is not the result of a partnership between AM & A and Tegler, as is required by the language of the statute. Further, none of the other meanings ascribed to the term "party in interest" apply here.

non-discriminatory classification requirements. She apparently assumes that 1) claiming employee status, and 2) imputing a discriminatory intent to AM & A's classifications in violation of § 410(b), is sufficient basis to infer a duty on the part of AM & A. The deficiency of this position lies in the lack of any obligation imposed by Regulation § 1.410(b)–4 on the part of the defendants or substantive relief afforded the plaintiff resulting from reliance on these provisions. This Court is therefore obliged to suppose, *sua sponte*, that plaintiff's right to relief arises from the minimum participation requirements of § 1052(a), and the notice provisions contained in §§ 1021(a) and 1022(a)(1).

■ Under 29 U.S.C. § 1052(a)(1)(A), "[n]o pension plan may require, as a condition of participation in the plan, that an employee complete a period of service with the employer or employers maintaining the plan extending beyond the later of the following dates—(i) the date on which the employee attains the age of 21; or (ii) the date on which he completes 1 year of service." Section 1052(a) effectively prohibits participation requirements which discriminate against certain employees such as leased employees. A participant under 29 U.S.C. § 1002(7) is defined as "any employee or former employee of an employer ... who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employers."

The Supreme Court has found that a "participant" entitled to disclosure of ERISA plan information under § 1024(b)(4), refers to " 'employees in, or reasonably expected to be in, currently covered employment,' *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117, 109 S.Ct. 948, 957, 103 L.Ed.2d 80 (1989) (*citing Saladino v. I.L.G.W.U. Nat'l Retirement Fund*, 754 F.2d 473, 476 (2d Cir.1985)), or former employees who 'have ... a reasonable expectation of returning to covered employment' or who have 'a colorable claim' to vested benefits." *Firestone Tire*, 489 U.S. at 117, 109 S.Ct. at 958, (*citing Kuntz v. Reese*, 785 F.2d 1410, 1411 (9th Cir.) *per curiam, cert. denied*, 479 U.S. 916, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986)). "[A] claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future" in order to show that he or she "may become eligible." *Firestone Tire*, 489 U.S. at 117–118, 109 S.Ct. at 957.

The Supreme Court has also recognized that the minimum participation standards of § 1052(a) were created "(t)o ensure that employee pension expectations are not defeated." *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 510 n. 5, 101 S.Ct. 1895, 1899 n. 5, 68 L.Ed.2d 402 (1981). The scope of § 1052(a) was addressed by the Ninth Circuit where suit was brought by migrant farmworkers to compel the Secretary of Treasury to promulgate regulations relating to the participation status of seasonal workers: "ERISA does not require employers to provide employees with pension plans, but it does require employers with plans to meet ERISA's minimum standards for participating in the plan, accrual of benefits and vesting of benefits. ERISA requires that an employee must be eligible to participate in a plan after 'he completes 1 year of service,' which for ordinary workers is defined as 1,000 hours of employment in a 12 month period. 29 U.S.C. § 1052(a)(3)(A). Similarly, ERISA requires that an employee accrue benefits after a 'year of participation' defined as 1,000 hours of employment in a 12 month period. 29 USC § 1054(b)(3)(C)." *Fernandez v. Brock*, 840 F.2d 622, 624 (9th Cir.1988). In *Crouch v. Mo–Kan Iron Workers Welfare Fund*, 740 F.2d 805 (10th Cir.1984), although the plaintiff, a labor union employee, was excluded from participation in the union's welfare plan, she was entitled to participation in the union's pension plan because while "[29 USC §§ 1051(1) & 1081(a)(1) ] permit a welfare plan to discriminate against particular employees ... nothing in the portion of ERISA contained in the labor sections of the Code expressly exempts pension plans from the minimum participation, vesting and funding requirements of ERISA." *Crouch*, 740 F.2d at 808.

Section 1052(a) has a parallel provision dealing with qualification of trusts under IRC § 410(b). 26 U.S.C. § 410(b) is concerned with the minimum coverage requirements which may be imposed in order for an employee to be eligible for a qualified trust under 26 U.S.C. § 401(a), and is a minimum participation requirement under § 410.[7] The types of discrimination sought to be avoided through § 1052(a) are supplemented by Regulation § 1.410(b)–4, which describes more thoroughly the manner in which an employer's participation requirements may in actuality discriminate against certain classes of employees.[8]

■ It is worthwhile to reemphasize that the applicability of these Treasury Regulations to ERISA has been recognized through legislative decree and prior judicial determination, not only for the purpose of determining a plan's tax status, but also as persuasive authority in determining the rights of an employee to participation in an employee benefit plan. The Court in *Crouch* stated that since the participation and vesting rules of IRC §§ 401–415 "require the inclusion of a person in plaintiff's position in the plan" and that there are "obvious and significant benefits to meeting those requirements, we conclude that we must construe the plan as including plaintiff as a participant." *Crouch*, 740 F.2d at 809.

■ Also relevant to this inquiry are the reporting provisions of ERISA. Under 29 U.S.C. §§ 1021 and 1022(a)(1), every participant and beneficiary covered by an employee benefit plan is also entitled to receive a copy of the summary plan description and annual reports regarding that plan, which shall be furnished by the plan administrator. If a leased department employee may be considered an employee of the leasing organization, then that individual may be entitled, as a participant, to notice of the plan. While the Second Circuit has held that ERISA does not prohibit an employee from waiving the right to participate in a pension plan, that waiver must be "knowing and voluntary." *Laniok v. Advisory Committee*, 935 F.2d 1360, 1367 (2d Cir. 1991).[9]

### 2. Discussion

■ Based on the conclusion that plaintiff was an employee of AM & A, as stated in section II, par. 2, above, this Court determines that she met the minimum participation requirements of § 1052(a) and is a participant who is entitled to benefits under 29 U.S.C. § 1132(e). As an employee of AM & A, plaintiff was entitled to participate in the plan, and was unfairly denied the opportunity to do so by the defendant's failure to accord her participant status under § 1052(a) or provide the appropriate notice under §§ 1021(a) or 1022(a)(1).

7. Section 410(b)(2)(A)(ii) provides that the Secretary may determine whether a classification established by the employer discriminates in favor of highly compensated employees. For purposes of satisfying the average benefit percentage test, the Secretary is required to take all employees into account, regardless of whether they meet the plan age and service requirements. 26 U.S.C. § 410(b)(2)(D)(i). Regulation § 1.410(b)(9) elaborates as to the definition of "employee": "Employee means an individual who performs services for the employer who is either a common-law employee of the employer ... or a leased employee (not excluded under section 414(n)(5)) who is treated as an employee of the employer-recipient under section 414(n)(2) or 414(o)(2)." This definition is intended to assist in applying Regulation §§ 1.410(b)(2) through 1.410(b)(10).

8. Regulation § 1.410(b)–(4)(c)(3) sets forth the means by which a plan classification may be

labeled as nondiscriminatory in order to qualify for approval by the Secretary. Part of the process of determining whether a plan classification is nondiscriminatory depends upon an examination of "all the relevant facts and circumstances," including the underlying business reason for the classification, the percentage of employees benefitted, the types of employees benefitted under the plan, the difference between the plan's ratio percentage and the employer's safe harbor percentage, and the extent to which the average benefit percentage exceeds 70%. 26 C.F.R. § 1.410(b)–4(c)(3)(ii)(A) to (E). In considering these factors, "(n)o one particular fact is determinative." 26 C.F.R. § 1.410(b)–4(c)(3)(ii).

9. *Laniok* sets forth a list of factors to be considered when determining whether the waiver was valid.

Plaintiff's tenure with the jewelry department obviously fulfills the minimum age and service requirements of § 1052(a) in that she was over 21 and had completed one year of service when AM & A established its plan. As a participant in the plan, plaintiff was owed a duty by its administrator to provide her with a copy of the AM & A Pension Plan Summary Plan Description, which would have alerted her to the fact that her participation in the plan · was dependent upon Tegler's acceptance on behalf of the department. By defendant's own admission, this was never .done, thus depriving plaintiff of notice regarding her rights under the terms of the plan.

The decision of the Second Circuit in *Laniok* illustrates the extent of an eligible employee's rights with regards to an employer funded pension plan. Unlike the plaintiff in *Laniok*, plaintiff here was not given the option of "knowingly and voluntarily" waiving her right to participate in the plan. AM & A's decision to allow Tegler to accept or reject plan participation on behalf of employees of the jewelry department negated any options which those employees were entitled to under ERISA. Thus, the facts presented clearly show that plaintiff was denied her right to participate in the plan as a result of AM & A's policies regarding lease department employees.

Under § 1052(a), Tegler's decision to adopt or reject the plan on behalf of the jewelry department employees is irrelevant to affect their status as participants. AM & A and the AM & A Pension Plan do not legally possess the discretion, as plan administrators and fiduciaries, to condition participant status on the decision of the department head alone.

Plaintiff's argument that Regulation § 1.410(b)–4 conclusively demonstrates that the AM & A Pension Plan contains a discriminatory classification is incomplete on its face. Plaintiff fails to supply the necessary data for making such a determination under § 1.410(b)–4. Strictly speaking, even a convincing demonstration that defendants' system was a discriminatory classification under § 410(b) would only show that this was not a qualified tax plan.

However, this Court cannot ignore the authority of guidelines and regulations developed by the Treasury Department in interpreting provisions of ERISA. It is apparent from cases like *Crouch* that these regulations are not to be implemented only for the narrow purpose of determining tax qualification. They are useful for extracting subtler shades of meaning necessary to paint a more detailed portrait of an individual's substantive rights under ERISA.

For these reasons, it is evident that the plaintiff has demonstrated that she is entitled to pension benefits under ERISA.

## IV. *Standard of Review of Committee Determination*

 This Court has the authority to review the decision of the AM & A Pension Plan Committee (the "Committee") under a *de novo* standard where no discretionary authority has been delegated to the administrator or fiduciary under the plan. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. at 108, 109 S.Ct. at 953. Where discretionary authority has been allocated, the court is limited to scrutinizing the decision for evidence of abuse of that discretion.

 However, the court must utilize a *de novo* review in situations where, as here, the determination made turns on a question of law. A district court may not decide whether a fiduciary's decision is arbitrary and capricious unless it first determines "what the 'legally' correct interpretation of the plan should be." *Dennard v. Richards Group, Inc.,* 681 F.2d 306, 314 (5th Cir.1982). In *Weil v. Retirement Plan Admin. Comm. of the Terson Co.,* 913 F.2d 1045, 1049 (2d·Cir.1990), *aff'd in part and vacated in · part on other grounds,* 933 F.2d 106 (2d Cir.1991), the court examined a question involving the ability of plan fiduciaries to interpret plan provisions denying eligibility, in light of conflicting IRC sections. They ruled that "[h]ere, it is undisputed that the Plan gave the Committee discretionary authority to determine eligibility for benefits and to interpret the Plan.... Nonetheless, the Committee's decision to deny benefits to plaintiffs was unique in that it turned on a

question of law.... When an eligibility determination by plan administrators turns on a question of law, courts have not hesitated to apply a *de novo* standard of review." *Weil*, 913 F.2d at 1049, (*citing Sage v. Automation, Inc. Pension Plan and Trust*, 845 F.2d 885, 890 (10th Cir. 1988)); *See also, Bruch v. Firestone Tire and Rubber Co.*, 828 F.2d 134, 148–49 (3rd Cir.1987) *aff'd in part and rev'd in part on other grounds*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

As shown above, the committee's decision in the present case is based on a provision of the plan which is erroneous on a question of law. For that reason, this Court is empowered to conduct a *de novo* review of the plan itself to excise the offending article, and thus, has done so.

### V. *Plaintiff's Motion for Attorney's Fees and Costs*

Under 29 U.S.C. § 1132(g)(1), a district court is given the discretionary authority to award attorney's fees to either party when the situation calls for it. The test for when such an award is warranted is laid out in *Ford v. New York Central Teamsters Pension Fund*, 506 F.Supp. 180, 183 (W.D.N.Y. 1980), *aff'd*, 642 F.2d 664 (2d Cir.1981).

 While it appears plausible under the test enunciated in *Ford* to award attorney's fees in this case, I nevertheless decline to do so. Such an award is less appropriate where, as here, the losing party has presented a meritorious, albeit unsuccessful, argument in support of its position. For similar reasons, I conclude that an award of court costs also is not warranted in this instance.

### VI. *Conclusion*

It is the conclusion of this Court that plaintiff has presented evidence sufficient to warrant a finding that she was an employee of the defendant AM & A department store and participant in the pension plan, and thus, is entitled to benefits under 29 U.S.C. § 1132(e).

ORDER

IT HEREBY IS ORDERED, that defendants' motion for summary judgment is DENIED.

FURTHER, that plaintiff's cross motion for summary judgment is GRANTED.

FURTHER, that plaintiff's motion for attorney's fees and court costs is denied.

FINALLY, that the parties shall appear before this Court on Wednesday, December 2, 1992 at 9:00 a.m. in Part IV, Mahoney State Office Building, 65 Court Street, Buffalo, New York for a status conference on the issue of benefit amount.

SO ORDERED.