**Richard T. HEISE, Plaintiff,**

v.

**GENUINE PARTS COMPANY, Genuine Parts Company Pension Plan, and Earl Dolive, Edward Jones and Lewis Rice, individually and as the Plan Administrator for the Genuine Parts Company Pension Plan, Defendants.**

**Civ. No. 4–93–954.**

United States District Court,
D. Minnesota,
Fourth Division.

Sept. 5, 1995.

Bruce C. Recher, Henson & Efron, Mpls, MN, for Richard T. Heise.

William John Egan, Rider Bennett Egan & Arundel, Mpls, MN, Robert N. Godfrey, Smith Currie & Hancock, Atlanta, GA, Gregory C. Braden, Craig R. Pett, Alston & Bird, Atlanta, GA, for Genuine Parts Company.

William John Egan, Rider Bennett Egan & Arundel, Minneapolis, MN, Robert N. Godfrey, Smith Currie & Hancock, Atlanta, GA, Gregory C. Braden, Alston & Bird, Atlanta, GA, for Genuine Parts Co. Pension Plan.

William John Egan, Rider Bennett Egan & Arundel, Minneapolis, MN, Gregory C. Braden, Alston & Bird, Atlanta, GA, for Earl Dolive, Edward Jones, Lewis Rice.

## ORDER

DOTY, District Judge.

This matter is before the court on plaintiff's motion for partial summary judgment and defendants' motion for summary judgment. Based on a review of the file, record and proceedings herein, and for the reasons stated below, the court denies plaintiff's motion and grants in part and denies in part defendants' motion.

## BACKGROUND

Plaintiff Richard T. Heise ("Heise") was employed by defendant Genuine Parts Company ("Genuine Parts") from 1984 until October 1992, as an outside sales representative in the Minneapolis division of Genuine Parts. In this position, Heise sold NAPA auto parts to existing and potential customers, serviced his customers' inventory and worked at the retail store on alternate Saturdays in his assigned Minneapolis territory. Heise's compensation was based strictly on commissions. During the last full year of his employment, Heise earned approximately $52,000. Heise was one of 16 outside sales representatives employed by the Genuine Parts' division in Minneapolis; John Ransii ("Ransii") was Heise's immediate supervisor.

As described by Genuine Parts, the primary function of an outside sales representative was to call on the customer's place of business and to sell NAPA parts. The job also included making "cold" sales calls on potential customers, establishing new stocking accounts and meeting sales quotas. The secondary functions of the job included phys-

ically setting up customers' inventory. The listed requirements for the job included a valid driver's license, daily customer visits, the ability to lift 60 pounds consistently, the physical ability to move about the store's layout, good marketing skills and the ability to work inconsistent hours.

In 1977, at the age of twenty and prior to his employment at Genuine Parts, Heise began to experience severe headaches which became progressively worse over the years. In 1987, he was diagnosed with Arnold Chiari Malformation, a birth defect where the spine pulls the brain into the skull. In November 1988, Heise underwent posterior facet decompression surgery in an attempt to correct the disorder. In January 1989, Heise underwent additional surgery to correct complications which had developed after the first surgery. Neither surgery corrected the headaches and there is no cure for Heise's condition.

According to Heise, the headaches are unpredictable in duration and severity. Notwithstanding the unpredictability of his headaches, Heise worked full-time for Genuine Parts until he was placed on disability leave. Further, with the exception of his absence in 1989 for surgery, Heise had few absences. During 1991, Heise missed a total of eight days. In January 1992, Heise missed two days due to an ear infection and did not miss any days during February and March 1992. Genuine Parts did not have an attendance policy which indicated the number of days an employee can miss or the number of sick days that were available.

Despite the presence of headaches, Heise performed well as an outside salesperson. He received acknowledgment for his outstanding sales performance and was the top salesperson in his area in 1990. Genuine Parts never informed Heise that his performance was unacceptable or that any absences were excessive. Indeed, Heise consistently received positive job evaluations, even during the spring of 1992 when he was below quota. Genuine Parts also never received any complaints about Heise's performance from the customers in his territory.

On April 11, 1992, Heise was hospitalized for three days due to the severity of his headaches and spent the remainder of that week at home. During this hospitalization, Heise and his family learned that there was no cure for his disability and that the best he could hope for was effective management of the headaches through various drugs. Heise's wife, Molly, communicated this information to Heise's supervisor, John Ransii. Heise returned to work on April 20, 1992. On April 23, 1992, Heise and his wife, Molly, met with Heise's supervisor at Ransii's request. What happened at this meeting is disputed.

According to Heise and his wife, Ransii stated that the company had to take a new stance towards his health problems in light of recent information that Heise could not be cured. Ransii stated if Heise was sick again, he would be placed on sick leave and at the end of the sick leave, Heise would be placed on inactive status. Ransii did not define the term sick when asked by Heise. Heise asked if he could work evenings or weekends or if he could use his vacation time if he needed to be absent because of his headaches. Ransii replied, "That's not the point." An alternative position was suggested by Ransii, which Ransii immediately indicated was not feasible. Ransii also discussed Genuine Parts' pension plan. At this point in the meeting, Ransii asked Norris Lovstuen ("Lovstuen"), the personnel manager for the Minneapolis division of Genuine Parts, to join the meeting. Lovstuen explained the application process for disability retirement benefits and provided the Heises with a rough estimate, approximately $1,300 per month. This estimate represented the disability benefit that Heise would be entitled to under the Genuine Parts Company Pension Plan ("the Plan"). Apparently, Ransii and the Heises were surprised that the disability pension was so low.

Ransii agrees with the Heises regarding the substance of the conversation during the April 23, 1992, meeting, but does not recall any details, nor does he recall exactly what he said. Ransii admits he did not elaborate on the meaning of sick. He also agrees that the meeting was called because of the new information provided by Ms. Heise. Ransii believes two alternative positions were dis-

cussed and denies that he indicated unequivocally that these positions were unsuitable. He apparently does not admit or deny responding to Heise that accommodation was not the point. Following this meeting, Heise sought additional medical treatment, including drug treatment that he had previously rejected. On May 7, 1992, Heise was hospitalized again. On May 12, 1992, Genuine Parts notified Heise that he was being placed on short term disability leave.

In August 1992, as the end of Heise's disability leave approached, Molly Heise spoke with Ransii about back-to-work criteria for Heise. According to Ms. Heise, Ransii stated that Heise must be cured before he could return to his job. Ms. Heise reiterated that Heise could not be cured. Genuine Parts denies that Heise needed to be cured prior to resuming work with the company, instead, Heise was told he needed to be released by a physician.

On August 25, 1992, Heise was notified that he qualified for social security disability benefits. Thereafter, he decided to apply for disability retirement benefits under the Plan. In October 1992, Genuine Parts notified Heise that his disability retirement benefits were approximately $373 per month, not $1,300 per month as estimated by Lovstuen. The lower monthly benefit was due to the actuarial adjustment required by Section 415 of the Internal Revenue Code. Heise appealed the calculation of his disability retirement benefit, however, the lower benefit was affirmed by the Pension Plan Committee ("the Committee") which consisted of George Kalafut, Jerry Nix and Lewis Rice. The record, however, does not contain a written notification of this denial. After first filing charges with the Equal Employment Opportunity Commission ("EEOC") and the Minnesota Human Rights Commission and then withdrawing those charges, Heise filed this suit alleging, among other counts, violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. Discovery has been completed. Heise moves for partial summary judgment; Genuine Parts moves for summary judgment.

## DISCUSSION

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment as a matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510–11.

On a motion for summary judgment, the court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in its favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, judgment as a matter of law should not be granted. *See Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511–12. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. With this standard at hand, the court will consider the parties' motions.

## I.

### A. Standard Of Review

As a threshold matter, the parties dispute what standard of review the court

should apply. Heise urges the court to conduct a *de novo* review; defendants, on the other hand, contend that the court can review only for abuse of discretion. A deferential standard of review is applied if the plan gives the administrator discretionary authority to interpret the terms of the plan or to decide disputed eligibility questions. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). When such discretion is lacking, the court undertakes a *de novo* review of the plan's terms and other manifestations of the parties' intent. *Id.* at 113, 109 S.Ct. at 955–56.

The Plan document provides that:

In addition to all implied powers and responsibilities necessary to carry out the objectives of the Plan and to comply with the requirements of the Act, the Committee shall have the following specific powers and responsibilities:

(1) to construe the Plan and Trust Agreement and to determine all questions arising in the administration, interpretation and operation of the Plan;

(2) to decide all questions relating to the eligibility of Employees to participate in and to receive benefits under the Plan and Trust Agreement;

(3) to determine the benefits of the Plan to which any Participant or Beneficiary may be entitled; ...

Plan Document, ¶ 8.06, pg. 41. Relying on this language, Genuine Parts asserts that the Committee's calculation of Heise's disability retirement benefit is subject to a discretionary standard of review and should be set aside only if it is unreasonable. Heise agrees that the Plan gives discretionary authority to the Committee to construe the terms of the Plan and to make eligibility determination, nevertheless, Heise argues that the Committee did not interpret the Plan when it denied his benefits, rather the Committee interpreted the Internal Revenue Code. Heise asserts therefore that the Committee's application of section 415 to his benefits is a legal conclusion which is accorded no deference by the court.

Although Heise's argument has a certain appeal, it is unpersuasive. Heise argues that, where a benefit determination turns on a questions of law, the court should not defer to the legal conclusion of the plan administrator. *See Shapiro v. Joint Industry Bd. of Elec.*, 858 F.Supp. 356, 359 (E.D.N.Y.1994) (citing *Weil v. Retirement Plan Administrative Committee of the Terson Co., Inc.*, 913 F.2d 1045, 1049 (2d Cir.1990), *vacated in part*, 933 F.2d 106 (2d Cir.1991)); *Renda v. Adam Meldrum & Anderson Co.*, 806 F.Supp. 1071, 1083 (W.D.N.Y.1992). The court is not persuaded, however, that the Committee's calculation of Heise's benefits turns on a construction of Section 415. This case concerns the way Heise's disability benefit has been calculated under the Plan. The calculation necessarily depends on an interpretation of the plan terms. In particular, the Committee's decision depends on an interpretation of annual benefit and retirement benefit. Annual benefit is defined in the Plan without reference to Section 415 of the Code; the term retirement benefit is not defined at all. The Plan expressly gives the Committee discretion to determine eligibility for benefits and to construe and interpret plan terms. The court, therefore, applies a deferential standard of review when analyzing the calculation of Heise's benefits.[1] Regardless of the applicable standard of review, however, the plan must be given its natural construction and should comport with the purpose of pension plans generally. *See Gruenke v. Miles, Inc.*, 872 F.Supp. 652 (D.Minn.1995).

**B. Calculation of Benefits.**

 Count IV alleges a violation of Section 1132(a)(1)(B) of ERISA regarding a claim for benefits. A decision of a fiduciary regarding benefits is an abuse of discretion if the action is "extraordinarily imprudent or extremely unreasonable." *Lutheran Medical Ctr. v. Contractors Health and Welfare Plan*, 25 F.3d 616, 621 (8th Cir.1994) (quoting

---

**1.** The court notes that even if it applied a *de novo* standard of review, it would ultimately reach the same conclusion in this case.

*Cox v. Mid–America Dairymen, Inc.,* 965 F.2d 569, 572 (8th Cir.1992)). To the extent that a decision involves an interpretation of disputed plan terms, it will be upheld if it is reasonable, regardless of whether it is the best interpretation possible. *Erickson v. Aetna Life Ins. Co.,* 777 F.Supp. 1463, 1466 (D.Minn.1991) (citing *Simmons v. Diamond Shamrock Corp.,* 844 F.2d 517, 523 (8th Cir. 1988)). At the heart of the parties dispute is the undefined term "retirement benefit," referenced in the defined term "annual benefit." Plan Document, ¶ 13.04(a), pg. 57. Heise argues that disability benefits under the Plan are not retirement benefits, rather they are preretirement benefits not directly related to retirement or, in other words, ancillary benefits as referenced in Section 415. Genuine Parts, on the other hand, asserts that disability benefits are retirement benefits.[2] Neither retirement benefit nor disability benefit is defined under the Plan. The court, based on an extensive examination of the Plan and Section 415, as well as giving deference to the Committee, finds that the Committee's decision that Heise's disability benefit is a retirement benefit, and thus subject to Section 415, is reasonable and comports with the terms of the Plan.

In reviewing the reasonableness of Genuine Part's decision, the court begins with the language of the Plan. Article IV provides for retirement dates and benefits. Four retirement options are available for participants who are covered by the Genuine Parts Pension Plan: normal retirement, early retirement, disability retirement and delayed retirement. Plan Document, Article IV, ¶¶ 4.01–4.04, pg. 16–21. A participant is eligible for disability retirement if he has at least five years of credited service with the company and becomes permanently disabled. Plan Document, ¶ 4.03(a), pg. 17. Both parties agree that Heise was entitled to disability retirement as he had approximately eight years of credited service and qualified for social security benefits on August 25, 1992. Disability retirement benefits are calculated in the same manner as normal retirement benefits except for slight modifications in the applicable formula.[3]

According to the Committee, once Heise's disability benefit is calculated under this formula it is subject to the limits set forth in Article XIII. Paragraph 13.01 of Article XIII states that "annual benefits" are limited to a "maximum permissible amount." Plan Document, ¶ 13.01, pg. 56.[4] "Annual benefit" is a retirement benefit under the Plan which is payable annually in the form of a straight life annuity. Plan Document, ¶ 13.04, pg. 57. As stated, retirement benefit is not defined, rather the Committee determined that dis-

**2.** The court notes that Genuine Parts phrases this argument somewhat differently, referring instead to whether the disability benefit is a life annuity subject to the limits of Section 415. This distinction is not material, however, as the obvious focus is on an interpretation of annual benefit.

**3.** For disability benefits, the average earnings used is the greater of the participant's current monthly earnings or 1/12th of the participant's previous calendar year earnings. Plan Document, ¶ 4.03(b)(ii), pg. 18. In calculating a normal retirement income, the amount used is the greater of 30% of the participant's average earnings or a rated percentage of average earnings based on years of credited service minus 50% of the participant's anticipated monthly social security benefit. Plan Document, ¶ 4.01(b), pg. 16. Further, disability retirement benefits are not reduced by the fraction set forth in Section 4.01(c) for participants who have less than fifteen years of credited service. Plan Document, ¶ 4.03(b)(iii), pg. 18.

**4.** Section 13.01 of the Plan provides, in part, that:

The annual benefit under this Plan payable to a Participant at any time shall not exceed the maximum permissible amount. "Maximum permissible amount" shall mean the lesser of (i) $90,000 (such limitation to be adjusted automatically as determined by the Commissioner of Internal Revenue for each calendar year of the date of the adjustment); or (ii) 100 percent of the Participant's highest average compensation. If the annual benefit commences before or after the Participant's Social Security Retirement Age, the maximum permissible amount shall be determined under Section 415 of the Code and Regulations and rulings thereunder. If the annual benefit commences when the Participant has less than ten years of Credited Service with the Company or less than ten years of participation in this Plan or any predecessor plan to this Plan, the maximum permissible amount otherwise defined above shall be reduced by one-tenth for each year less than ten in accordance with applicable regulations.

Plan Document, ¶ 13.01, pg. 56.

ability benefits, payable annually as a straight life annuity, were retirement benefits.

█ In determining the reasonableness of the Committee's interpretation of retirement benefit, the court must consider five factors: (1) whether the interpretation is consistent with the goals of the Plan; (2) whether it renders any language in the Plan meaningless or internally inconsistent; (3) whether it conflicts with the substantive or procedural requirements of ERISA; (4) whether the Plan has consistently interpreted this provision; and (5) whether the interpretation is contrary to the clear language of the Plan. *Finley v. Special Agents Mut. Ben. Ass'n, Inc.*, 957 F.2d 617, 620–22 (8th Cir.1992).

The court finds that the interpretation of the Committee is reasonable. The interpretation is consistent with the goals of the Plan. As stated, the Plan provides four retirement options, including Disability Retirement, and as applied all forms of retirement are equal in value. This interpretation, however, does appear to render meaningless language in the third sentence of Paragraph 13.04(a) which states "[n]o actuarial adjustment to the benefits is required for ... (ii) the value of benefits that are not directly related to retirement benefits (such as a disability benefit, pre-retirement death benefits, and post-retirement medical benefits.)" Plan Document, ¶ 13.04(a), pg. 57. This language is taken from the Regulations interpreting Section 415 and relates to adjustments for retirement benefits which are paid in a form other than a straight life annuity. *See* 26 C.F.R. § 1.415–3(c)(i); 26 C.F.R. § 1.415–3(c)(ii). Actuarial Equivalent, under the Plan and referenced in the sentence immediately preceding the above-quoted sentence, is defined as "a benefit of equivalent value computed in accordance with the actuarial assumptions described below." Plan Document, ¶ 2.03, pg. 3. Thus, logically this sentence states that it is unnecessary to include the value of disability benefits when equating other forms of benefits with a benefit payable as a straight life annuity. This language is super-

fluous because disability benefits do not need to be equated to a straight life annuity because they are only paid as a straight life annuity. The fact that Genuine Parts' interpretation renders one portion of a sentence meaningless weighs against the reasonableness of its decision.

Third, Heise has pointed to no substantive or procedural requirements of ERISA that Genuine Part's interpretation violates. Heise argues, however, that the interpretation is contrary to the language and legislative history of Section 415. The court disagrees. Section 415 mandates certain benefit limitations in order for a pension plan to qualify for favorable tax treatment. *See* 26 U.S.C. § 401(a)(16) ("A trust shall not constitute a qualified trust under this section if the plan of which such trust is a part provides for benefits or contributions which exceed the limitations of section 415."). Section 415(b) provides that:

(1) In general.—Benefits with respect to a participant exceed the limitation of this subsection if, when expressed as an annual benefit (within the meaning of paragraph (2)), such annual benefit is greater than the lesser of—

(A) $90,000,[5] or

(B) 100 percent of the participant's average compensation for his high 3 years.

26 U.S.C. § 415(b). If an annual benefit is payable in any form other than a straight life annuity, this benefit must be actuarially adjusted to equal the value of a straight life annuity. 26 U.S.C. § 415(b)(2)(B). Certain values, however, are not taken into account when making the actuarial adjustment, including "ancillary benefits not directly related to retirement income benefits." 26 U.S.C. § 415(b)(2)(B). Section 415(b)(2)(B), however, is inapplicable to the facts of this case because the disability retirement benefit provided under the Plan is paid as a straight life annuity. Further, at most, Section 415(b)(2)(B) means that the value of such ancillary benefits can be disregarded when making the necessary adjustment to equate benefits which are not paid in the form of a

---

**5.** The $90,000 limit is adjusted to reflect post–1986 cost-of-living increases. For the limitation year at issue, beginning January 1992, this dollar amount was $112,221.

straight life annuity to the actuarial equivalent of a straight life annuity. It does not limit the application of Section 415(b). Section 415 clearly provides that, for benefits payable in a straight life annuity and that commence before or after the social security retirement age, the $90,000 limit must be adjusted so that it equals an annual benefit which is equivalent to a $90,000 annual benefit beginning at the social security retirement age. 26 U.S.C. § 415(b)(2)(C). Thus, the Committee's interpretation comports with Section 415.

Fourth, the court notes that Genuine Parts has not applied the definition of retirement benefit consistently. Indeed, until January 1992, Genuine Parts did treat disability benefits as preretirement or ancillary benefits not subject to the limits of Section 415. This inconsistent interpretation weighs against a finding of reasonableness. However, the interpretation is in conformity with the clear language of the Plan. "Retirement" is "the date the Participant actually ceases Employment for Early Retirement, Normal Retirement, Disability Retirement or Delayed Retirement, whichever is applicable." Plan Document, ¶ 2.45, pg. 12. "Retirement Income" means "any amount payable to or on behalf of a Participant, Beneficiary or Spouse in accordance with the provisions of the Plan." Plan Document, ¶ 2.46, pg. 12. Disability retirement benefits are paid as a "Life Annuity Option." Plan Document, ¶ 4.03(a), pg. 17. A "Life Annuity Option" is a "monthly retirement income payable during the participant's lifetime, with payments ceasing upon the participant's death." Plan Document, ¶ 6.01(a), pg. 33. Reading the Plan as a whole, and considering the definition of annual benefit and maximum permissible benefit, the Committee's determination that disability benefits are retirement benefits is supported by the clear language of the Plan.

In support of his interpretation, Heise points to the fact that he has no immediate right to receive retirement benefits at age 37. Heise also focuses on the ancillary nature of the benefit as it is not provided in the absence of a disability. Finally, Heise points to the different benefit described in the Summary Plan Description. The court agrees that Heise's interpretation is plausible. The argument finds limited textual support in the Plan, including a statement on page 57 and the fact that disability benefits do have a limited death benefit if a participant dies within the first 12 months of receiving disability benefits. Plan Document, ¶ 4.03(f), pg. 19. Further, as discussed *infra*, the Summary Plan Description is misleading. Heise's argument, however, although plausible, draws a distinction between the disability retirement benefit and the other types of retirement benefits which is not warranted by a construction of the document as a whole. Based on a consideration of the *Finley* factors, the court concludes that Genuine Parts reasonably interpreted its Plan when it determined that Heise's disability benefit was a retirement benefit subject to the limits of Section 415. Applying these limits, Genuine Parts determined that an annual benefit of $6,094 commencing at age 35 was the actuarial equivalent of $112,221 commencing at age 67. This determination is neither arbitrary nor capricious.

 Heise also argues that he is entitled to an unreduced disability benefit based on the fact that the Summary Plan Description ("SPD") provided by Genuine Parts is misleading. ERISA requires that participants and beneficiaries of an employee benefit plan be provided with a written summary plan description that reasonably apprises employees of their rights and obligations under the Plan. 29 U.S.C. § 1022(a)(1). A SPD must not have the "effect [of] misleading, misinforming or failing to inform participants and beneficiaries." 29 C.F.R. § 2520.102–2(b) (1994). Where the terms of the SPD conflict with the terms of the Plan, the terms of the SPD govern the claim for benefits. *Jensen v. SIPCO, Inc.,* 38 F.3d 945, 952 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1428, 131 L.Ed.2d 310 (1995). If an employee seeks to enforce the terms of the SPD, he must establish that he relied detrimentally on those terms. Heise asserts that the SPD is inaccurate because the description of disability benefits fails to inform participants that the disability benefits will be reduced by Section 415. The description of disability retirement does not state that ben-

efits are subject to the limits of Section 415. The SPD, however, does make this reduction clear in the section entitled "Additional Information." *See* Summary Plan Description, pg. 14–15; Summary Plan Description, ¶ 14, pg. 29. Paragraph 14 states in part:

> For a participant who chooses a method of payment other than the Life Annuity Option, or whose pension payments begin at a time other than the Social Security Retirement Age, the actuarial equivalent value of the maximum just described (based on Section 415 of the IRS Code).

Summary Plan Description, ¶ 14, pg. 29. As defined in the Plan, the "maximum annual benefit" payable under the Plan limits benefits to the maximum established by Section 415. Heise also argues, however, that the SPD contains an inaccurate example. Summary Plan Description, Disability Retirement Pension Amount, Example 15, pg. 43. The inaccuracy of the example could not be more evident. Example 15 describes the benefits available to an employee similar to Heise, however, with a smaller monthly income. Example 15, unlike the example for early retirement, does not reference the applicable deductions that are necessary in the case of a benefit that commences prior to the Social Security Retirement Age. While it may be sufficient to describe benefits in one section of a SPD and then limit them in another, it cannot be sufficient to set forth clarifying examples which do not lead to the correct disability calculation. Summary plan descriptions must be read as a whole. Reading the SPD as a whole and taken in the most natural light, the court finds that the description and calculation of the disability retirement benefit is misleading.

■ Thus, the terms of the SPD will control if Heise can demonstrate reliance on the misleading terms. Genuine Parts argues that reliance is lacking, thus, summary judgment on this point should be granted in its favor. Heise testified that after the meeting with Lovstuen, he use the SPD to help him calculated his disability benefits. He also avers in an affidavit that he relied on that amount when he later decided to elect disability retirement. Genuine Parts argues, however, that Heise testified he could not

think of anything he would have done differently in November 1992, had he learned of the inaccurate disability amount. Heise stated, regarding his reliance on the estimated amount, that "[t]he headaches had got all out of control because of the whole situation I was put in. Otherwise, it would have been business as usual." Heise Deposition, pg. 131–32. Reading Heise's deposition as a whole, the court finds that this testimony does not unequivocally prove a lack of detrimental reliance. Heise's averment of reliance must be viewed in context, a context replete with factual disputes. As discussed *infra,* a question of fact exists regarding the extent of Heise's disability throughout the spring, summer and fall of 1992. Questions also exist as to whether Genuine Parts encouraged Heise to apply for disability benefits, whether it declined to give Heise back-to-work criteria and whether Genuine Parts maintained a "100% cured" policy with respect to Heise. Based on this record, the court concludes that Heise has presented sufficient evidence from which a reasonable jury could conclude that he relied to his detriment upon the misleading example in the summary plan description. Accordingly, summary judgment is inappropriate on Count IV.

**C. Estoppel.**

■ Count V alleges an estoppel claim under federal common law. A plaintiff may assert a claim of estoppel where the terms of the plan are ambiguous and the communications constitute an interpretation of that ambiguity. *Slice v. Sons of Norway,* 34 F.3d 630, 634 (8th Cir.1994). In the complaint, Heise does not point to any ambiguous provision in the Plan nor does Heise argue that Lovstuen, Genuine Parts' personnel representative in Minneapolis, was interpreting the Plan when he estimated Heise's disability retirement benefit. Rather, Heise admits that Lovstuen was unaware of any interpretation of the Plan regarding the calculation of disability retirement benefits and, in fact, the estimate was a result of incomplete information on his part. Estoppel under federal common law is limited as it cannot be used to enforce extracontractual promises. The existence and interpretation

of an ambiguity is critical. Even assuming the Plan is ambiguous regarding the calculation of disability retirement benefits, the communications at issue are not an interpretation of any such ambiguity. Accordingly, the court grants summary judgment in favor of Genuine Parts on Count V.

### D. Discrimination Under ERISA.

Count III alleges that Genuine Parts discriminated against Heise with regards to the attainment of medical benefits in violation of 29 U.S.C. § 1140.[6] This section provides, in part, that:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the Plan ... [or ERISA].

29 U.S.C. § 1140. To establish a prima facie case under Section 510, a plaintiff must show that he: (1) is entitled to ERISA's protections; (2) was qualified for the position; and (3) was discharged under circumstances that give rise to an inference of discrimination. *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir.1995). The welfare benefit plan provided by Genuine Parts is subject to the requirements of ERISA, thus, as a participant, Heise is entitled to ERISA's protections. Although Heise's qualification for the position of outside salesperson is disputed, as discussed *infra*, the court finds that Heise has made a prima facie showing that he was qualified for the position. Heise also alleges that during the meeting on April 23, 1992, his supervisor, John Ransii, raised the issue that he would qualify for Medicare in two years. In light of the limited showing necessary for Heise to sustain his burden of proof, the court finds that Heise has alleged sufficient circumstantial evidence to support an inference of discrimination.

Once Heise establishes a prima facie case, the burden of production shifts to Genuine Parts to rebut Heise's showing. *Id.* at 38. Thus, Genuine Parts must show a legitimate, nondiscriminatory reason for its actions toward Heise. Genuine Parts claims that Heise was not performing his job satisfactorily. This rationale satisfies Genuine Parts' burden of production. Finally, the burden falls to Heise to establish that Genuine Parts acted with the specific intent of interfering with his rights. *Id.* at 38–39. Thus, Heise must demonstrate sufficient evidence for a reasonable jury to conclude that Genuine Parts' articulated reasons are a pretext for discrimination and that it acted with specific intent. Heise, however, has come forward with no additional evidence beyond a cryptic reference to Medicare availability in two years. Further, as Genuine Parts' points out, it worked on Heise's behalf in order to make the medical benefits available to him in October 1991. Viewing the evidence in the light most favorable to Heise, the court concludes that Heise has not produced sufficient evidence to support a finding of interference with protected rights under ERISA. Accordingly, the court grants defendants' motion for summary judgment on Count III.

### E. Breach of Fiduciary Duties.

Count VI alleges that Genuine Parts, as plan administrator, breached its fiduciary duty under 29 U.S.C. § 1104(a)(1)(D).[7] Genuine Parts argues that individuals cannot recover for breach of fiduciary duties on their own behalf. Before the court heard arguments on this case, however, the Eighth Circuit held that individuals can recover for breach of fiduciary duties under Section 1132(a)(3). *Howe v. Varity Corp.*, 36 F.3d 746, 754 (8th Cir.1994), *cert. granted*, —— U.S. ——, 115 S.Ct. 1792, 131 L.Ed.2d 720 (1995). Relief under Section 1132(a)(3), however, is limited to equitable relief such as an injunction or restitution and does not include compensatory damages.

---

6. Although Heise's complaint alleges interference with pension benefits also, Heise has not pursued this argument in its submissions to the court.

7. On May 25, 1994, the court granted Heise's motion to voluntarily dismiss all claims against the individual defendants.

*Howe,* 36 F.3d at 756–57. Misrepresentations and misleading communications to plan participants support a claim for breach of fiduciary duty. *Id.* at 753. The only arguably misleading communication alleged by Heise is the benefit calculation by Norris Lovstuen. Heise does not argue, however, that Lovstruen is a fiduciary within the meaning of ERISA, nor has Heise presented any authority on this point. Accordingly, the court grants Genuine Parts' motion for summary judgment on Count VI.

### F. State Law Claims.

 Count VII states a claim for intentional infliction of emotional distress. To state a claim, Heise must show: (1) extreme and outrageous conduct; (2) which is intentional or reckless; and (3) that causes severe emotional distress. *Dornfeld v. Oberg,* 503 N.W.2d 115, 117 (Minn.1993). The extreme and outrageous conduct must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 439 (Minn.1983). Heise does not identify, however, which acts or omissions form the basis of this claim. Based upon a review of the complaint, the court concludes that Heise fails to allege sufficient facts to support a finding of extreme or outrageous conduct. Count VIII purports to state a claim for breach of an employment contract. Heise has presented no evidence of such a contract. Accordingly, Counts VII and VIII are dismissed.

## II.

### A. Americans with Disabilities Act.

Heise also alleges violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq.* The ADA provides that no employer "shall discriminate against a qualified individual with a disability in regard to [ ] the hiring, advancement or discharge of employees." 42 U.S.C. § 12112. The ADA defines "disability" as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2). A qualified individual with a disability is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Under the terms of the ADA, the accommodation must be reasonable and must not impose an undue hardship, such that the employer would be forced to incur significant difficulty or expense. 42 U.S.C. § 12112(b)(5)(A); 42 U.S.C. § 12111(10)(A).

 To establish a prima facie case of disability discrimination under the ADA, Heise must show that: (1) he is a disabled person within the meaning of the ADA; (2) qualified, with or without a reasonable accommodation, to perform the essential functions of the job; (3) that he suffered an adverse employment decision; and (4) was replaced by a non-disabled or less severely disabled individual. *Hutchinson v. United Parcel Service, Inc.,* 883 F.Supp. 379 (D.Iowa 1995). To ultimately prevail on his ADA claim, Heise must establish that Genuine Parts terminated him, or subjected him to an adverse employment action "because of" his disability. *Mason v. Frank,* 32 F.3d 315, 318–19 (8th Cir.1994). Under the ADA, Heise's claim of discrimination is subject to the familiar burden-shifting scheme. *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1111–12 (8th Cir.1995).

Genuine Parts does not dispute that Heise is disabled within the meaning of the ADA, that he was replaced with individuals that were not disabled or that he suffered an adverse employment decision. Genuine Parts argues, however, that Heise is not a qualified individual with a disability. Specifically, Genuine Parts asserts that Heise is not qualified because he was totally disabled as of May 12, 1995, and further, was unable to perform the essential functions of the job of outside sales representative. Heise argues, on the other hand, that he was qualified for his position, disputes Genuine Parts' showing regarding the essential functions of his job and argues that numerous reasonable accommodations exist.

 To show that he is qualified, Heise must make a prima facie showing that he can perform the essential functions of a sales representative, with or without accom-

modation. Genuine Parts disputes the relevancy of this inquiry. Genuine Parts asserts that Heise was totally disabled as of May 12, 1992, thus, he cannot show that he is otherwise qualified. The court rejects this contention. First, Genuine Parts' position misstates Heise's initial burden. The term "qualified" under the ADA is defined to include the concept of reasonable accommodation. *White v. York Int'l. Corp.*, 45 F.3d 357, 363 (10th Cir.1995). Therefore, a determination of an individual's qualifications or disability cannot be made without a consideration of possible accommodations. Heise need only make a *de minimis* showing that he was otherwise qualified for his position or present sufficient evidence which raises a question of fact as to his qualifications. Moreover, the effective date of the ADA was July 26, 1992, thus, the relevant inquiry for purposes of Heise's ADA claim is from July 26, 1992, until November 1992, when Heise's short term disability expired. Second, contrary to Genuine Parts' assertion, the record does not support an irrefutable determination that Heise was totally disabled during the relevant time frame.[8] Heise was hospitalized on May 12, 1992, due to severe headaches and an adverse reaction to experimental treatment. Heise was not terminated at this time, however, he was unilaterally placed on disability leave. The evidence shows that Heise sought work criteria in August 1992, in the hope of returning to work before his five month leave term expired. He testified that toward the end of the summer his condition had improved sufficiently to perform the essential functions of the job. This testimony is corroborated by Dr. Peterson. Genuine Parts' reliance on the fact that Heise received social security disability benefits is also misplaced. Heise qualified for social security benefits on August 25, 1992. This fact is relevant to demonstrate the extent of his disability, however, it cannot be construed as a judgment that Heise could not

perform his job. *See Overton v. Reilly*, 977 F.2d 1190 (7th Cir.1992). Accordingly, the court concludes that a question of fact exists as to the extent of Heise's disability during the relevant time frame.

■ Assuming Heise was not totally disabled from July 26 through November 1992, the court must focus on the essential functions of the job and the evidence produced which demonstrates an ability to perform those essential functions. Essential functions are those functions which bear more than a marginal relationship to the job. *White*, 45 F.3d at 361. Although Heise retains the ultimate burden of proving that he can perform the essential functions of the job, with or without accommodation, "much of the information which determines [ ] essential functions lies uniquely with the employer." *Benson*, 62 F.3d at 1113. Thus, an employer's view of the essential functions of the job is relevant. 42 U.S.C. § 12111(8). The court must also consider how employees actually functioned at the time of the discriminatory acts.

Genuine Parts asserts that daily contact with customers is an essential function of the job. The company submitted a job description listing the essential functions of the position of outside salesperson. The description lists "able to drive to the customer's place of business on a daily basis" as a requirement. A sales representative, Arnie Bikers ("Bikers"), and Heise's supervisor also testified that it was important to visit customers at a certain time and on a certain day of each week. Bikers and Ransii also testified, however, that accounts would remain idle for several weeks over the course of a year as sales representatives took vacations and attended trade shows.

■ Heise agrees that customer contact is essential. He is after all a salesperson. Heise, however, questions the validity of the

---

8. To the extent Heise argues that his constructive discharge under the ADA commenced on April 23, 1992, and included the events of May 12, 1992, Genuine Parts is entitled to summary judgment. The ADA cannot be applied retroactively. The Minnesota Legislature, however, prohibited disability discrimination under the Minnesota Human Rights Act throughout this period. Thus,

Heise's claim of constructive discharge is cognizable under the MHRA. The court notes also that a question of fact exists as to whether Genuine Parts encouraged Heise to apply for disability retirement and failed to discuss accommodations, sufficient to establish constructive discharge in November 1992. *See Smith v. World Ins. Co.*, 38 F.3d 1456 (8th Cir.1994).

job description as it is not contained in the employment manual that Genuine Parts distributes on a national basis. The job description was also developed towards the end of 1992, several months after Heise was placed on short-term disability leave. Fundamentally, Heise challenges the company's position regarding the amount and timing of customer contact that is essential. Throughout his employment, there were periods when Heise's customer contact was limited, yet his performance surpassed the performance of the majority of sales representatives in the Minneapolis territory. Many other salespersons also had periods during which their accounts remained idle. Further, sales representatives' weeks were unstructured. Outside of the Monday morning meetings, sales representatives were given complete discretion to structure their work week. Although Bikers testified that he felt contact with customers at a certain time each week was essential, he offered no evidence that he followed such a routine. Accordingly, the court concludes that a question of fact exists as to the amount and timing of customer contact that is an essential function of the job.

 Assuming, arguendo, that regular or weekly customer visits to all customers was an essential function of Heise's job, the next inquiry is whether Heise could perform that function, and the other essential functions, with a reasonable accommodation. Heise has the burden of making a facial showing that reasonable accommodations exist. *Benson*, 62 F.3d at 1111–12 (citing *White*, 45 F.3d at 361.) As a potential accommodation to allow him to maintain the necessary amount of customer contact, Heise suggests that he could use accrued vacation time to cover the days when he was unable to report to work due to the severity of his headaches. Heise also requests some type of flexible time in which he could make up those portions of days in which he was unable to report to work. The court finds that these accommodations satisfy Heise's burden. *Benson*, 62 F.3d at 1113 (holding job restruc-

turing and reassignment or transfers are generally reasonable accommodations); *see also* 42 U.S.C. § 12111(9) (the term "reasonable accommodation" may included job restructuring, part-time or modified work schedules or reassignment to a vacant position). The record reflects that during the majority of his employment, Heise's absences due to his headaches did not exceed his allotted vacation time. The only time he was absent for a substantial time, he was placed on short-term disability and later returned to work. The record is also silent as to the number of permissible sick days available to Genuine Parts' employees, thus, providing additional leeway to Heise. Further, the job description lists the ability to work flexible hours as a requirement.[9] Thus, the court concludes that Heise has made a facial showing that a number of possible accommodations existed.

 Once Heise makes a facial showing that a reasonable accommodation is possible, the burden shifts to Genuine Parts to demonstrate that it is unable to accommodate Heise. *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1111–12 (8th Cir.1995) (citing *Mason v. Frank*, 32 F.3d 315, 318–19 (8th Cir.1994)). Genuine Parts unequivocally asserts these accommodations are unreasonable. Specifically, Genuine Parts argues that flexible hours were not possible because a number of customers were not available evenings or weekends. This position is somewhat disingenuous, however, in light of the fact that flexible hours were a requirement of the job and Heise had been successfully performing his job for eight years under a flexible hours approach, as well as the lack of evidence regarding the hours that other sales representatives actually worked.

 Accommodation means "that an employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538,

---

**9.** Heise also suggests redistribution of some of the marginal functions of his job, like the Saturday store rotation. If the Saturday rotation is not marginal, Heise suggests a transfer to anoth-

er store without the stairs that are in the northwest store, to enable Heise to work the Saturday rotations.

542 (7th Cir.1995). Such accommodations must be reasonable. Heise has presented evidence from which a reasonable jury could conclude that Genuine Parts was unwilling to consider reasonable possible accommodations. For example, Genuine Parts has a written ADA policy, distributed in February 1992, which directed supervisors to make a written check list of possible accommodations for the employee. No one at Genuine Parts completed this list prior to the placement of Heise on disability leave or during the summer when Heise sought work criteria. Further, when the issue of accommodation was first raised, Heise's supervisor stated, "That is not the point." Finally, when work criteria was requested in August 1992, Heise alleges that he was informed that he must be cured before he could return.[10] On the record presented, there exist numerous questions of fact regarding the existence and reasonableness of possible accommodations. Further, the court notes that Genuine Parts has presented no evidence that the proposed accommodations would present an undue financial hardship within the meaning of the ADA. *See* 42 U.S.C. § 12111(10)(B). Accordingly, the court concludes that summary judgment on Heise's ADA claim is inappropriate.

### B. Minnesota Human Rights Act.

Count II alleges that Genuine Parts violated the Minnesota Human Rights Act ("MHRA"), Minn.Stat. § 363.03 *et seq.* Minnesota law provides that it shall be an unfair labor practice for an employer to discharge or otherwise discriminate against an employee on the basis of a disability. Minn. Stat. § 363.03, subd. 1(2)(b), (c) and (6) (1994). Minnesota law parallels the ADA, thus, the preceding analysis precludes summary judgment on Heise's MHRA claim.

### CONCLUSION

Based upon a review of the file, record and proceedings and for the reasons stated, **IT IS HEREBY ORDERED** that:

10. The court notes that a "100% healed" policy is a *per se* violation of the ADA as such a policy does not allow for a case-by-case assessment of an individual's ability to perform the essential

1. The motion of defendants for summary judgment is granted as to Counts III, V, VI, VII, and VIII;

2. The motion of defendants for summary judgement as to Counts I, II and IV is denied in light of the numerous material factual questions; and

3. Plaintiff's motion for summary judgment is denied.

functions of the individual's job, with or without an accommodation. *Hutchinson v. United Parcel Service, Inc.,* 883 F.Supp. 379 (D.Iowa 1995).