# United States Court of Appeals
## For the First Circuit

————————————

No. 99-1651

MICHAEL J. WARD,

Plaintiff, Appellant,

v.

MASSACHUSETTS HEALTH RESEARCH INSTITUTE, INC.,

Defendant, Appellee.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., <u>U.S. District Judge</u>]

————————————

Before

Torruella, <u>Chief Judge</u>,

Cyr, <u>Senior Circuit Judge</u>,

and Stahl, <u>Circuit Judge</u>.

————————————

    <u>Arnold E. Cohen</u>, with whom <u>Bass, Doherty & Finks, P.C.</u> was on brief, for appellant.
    <u>Richard L. Alfred</u>, with whom <u>Marjory D. Robertson</u>, <u>Robert F. Schwartz</u> and <u>Hill & Barlow</u> were on brief, for appellee.
    <u>Loretta M. Smith</u>, <u>Cynthia L. Amara</u> and <u>New England Legal Foundation</u> on brief for Associated Industries of Massachusetts, amicus curiae.

————————————

April 12, 2000
_____

**TORRUELLA, Chief Judge.** This is an appeal from summary judgment for the defendant employer in a claim of wrongful discharge under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and the Massachusetts anti-discrimination statute, Mass. Gen. Laws ch. 151B, § 1. For the reasons discussed below, we reverse and remand for proceedings consistent with this opinion.

## I. BACKGROUND

The following facts are summarized in the light most favorable to the appellant. In September 1991, appellee Massachusetts Health Research Institute ("MHRI") hired appellant Michael Ward to split his time as a lab assistant and as a data entry assistant to the plasma program coordinator. The appellant did not notify MHRI of any disability at this time.

MHRI requires its employees to fill out daily time sheets under a "flex-time" schedule that allows all employees to start work any time between 7:00 and 9:00 a.m. and leave for the day after they have worked seven and a half hours. Beginning in early 1992, Ward would often arrive after 9:00 a.m. -- generally between 9:10 a.m. and 9:35 a.m., but occasionally as late as 10:00 a.m. or 12:00 noon. On those occasions, Ward would still work the required seven and a half hours.

In December 1992, Ward received a performance evaluation indicating that his tardiness interfered with his lab duties. Carly

Ferrin-Gardner, the supervisor of the screening laboratory, also issued a verbal warning, confirmed in a December 29, 1992 memorandum, noting that Ward had not made it to work by 9:00 a.m. in over three months. As a result, Ward was reassigned to a full-time data entry position working for Thomas Baldwin. Ward maintains that he informed Ferrin-Gardner at this time that he was late because his arthritis caused stiffness and pain in the mornings.

In Ward's July 29, 1993 written performance review, Ward's supervisor again commented on problems related to Ward's tardiness and his need for constant supervision to complete work in a timely manner. Shortly afterward, on August 4, 1993, one of Ward's doctors sent a note to MHRI identifying Ward as a patient who "suffers from an inflammatory arthritis, which may from time to time cause swelling and pain of the joints and interfere with activities." Ward was subsequently presented with the July review along with an August 13, 1993 written warning that addressed Ward's recurring tardiness despite repeated reprimands and put him on notice that further problems would result in disciplinary action up to and including dismissal. Ward challenges the accuracy of his second review, and again claims that he discussed his arthritis with Ferrin-Gardner.

On October 21, 1993, Ward's supervisor and another employee claim to have seen Ward arrive late, but enter 9:00 a.m. on his time

-4-

sheet.  Even though Ward denied that he falsified the entry, he was suspended for three days without pay.

When he returned to work, he submitted an employment form in which he indicated that he has a disability.  He also informed Patricia Leonard, the director of human resources, that he suffered from arthritis and requested a modified work schedule to accommodate his disability.  Ward did not provide, and Leonard did not seek, further medical information, before Leonard rejected his request on the ground that the ADA does not require an accommodation that would allow Ward to start work later than other employees -- i.e. the two-hour window in the morning should be sufficiently flexible.  Leonard never discussed this conversation with Ferrin-Gardner.

On March 4, 1994, after Ward arrived late on two consecutive days,[1] MHRI terminated his employment for excessive tardiness.  At the end of March, Ward's doctor wrote a letter to MHRI, discussing Ward's arthritic condition and explaining among other things that his symptoms "tend to be worse after a period of inactivity, and are especially prominent in the morning."

Ward filed this action on June 20, 1996 alleging that he was wrongfully discharged and was subject to a hostile environment in violation of the ADA and Mass. Gen. Laws ch. 151B, § 4(16).  The

---

[1] The timesheets from October 27, 1993 to March 4, 1994 are missing from the record.

district court granted summary judgment for MHRI on May 7, 1999.  On appeal, Ward only raises his claim that the ADA and state disability law were violated because he was not provided with reasonable accommodation of his disability and he was terminated because of his disability.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate if MHRI has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  We review the district court's summary judgment de novo and assess the facts in a light most favorable to Ward.  See Morris v. Government Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994).

Ward will defeat MHRI's motion for summary judgment if he has produced "specific facts, in suitable evidentiary form" that establish the presence of a genuine issue for trial.  Id.; see also Fed. R. Civ. P. 56(c).  A "genuine" issue is one supported by such evidence that "a reasonable jury, drawing favorable inferences," could resolve it in favor of the nonmoving party.  Smith v. F.W. Morse & Co., 76 F.3d 413, 427 (1st Cir. 1996); see also Libertad v. Welch, 53 F.3d 428, 435 (1st Cir. 1995).

## III.  AMERICANS WITH DISABILITIES ACT

To state a prima facie claim of disability discrimination under the ADA,[2] a plaintiff must prove by a preponderance of the evidence that:  (1) he was disabled within the meaning of the Act; (2) he was a qualified individual, i.e. able to perform the essential

_____

[2] The Supreme Judicial Court of Massachusetts has indicated that federal case law construing the ADA should be followed in interpreting the Massachusetts disability law.  See Labonte v. Hutchins & Wheeler, 678 N.E.2d 853, 856 n.5 (Mass. 1997); Wheatley v. American Tel. & Tel. Co., 636 N.E.2d 265, 268 (Mass. 1994).

functions of the position with or without reasonable accommodation; and (3) he was discharged because of his disability.  See Criado v. IBM Corp., 145 F.3d 437, 441 (1st Cir. 1998); Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 511 (1st Cir. 1996).  For purposes of summary judgment, the district court assumed that the appellant's arthritis was a disability under the ADA,[3] but granted summary judgment because the remaining two elements of a prima facie case were not satisfied.  We follow the district court's lead and focus on the second and third elements of the appellant's prima facie case.

At first glance, this seems to be an easy case -- we are inclined to presume that regular and reliable attendance is an essential function of any job, and if the appellant has pain and stiffness in the mornings that prevents him from arriving at work on time, then he should start his day earlier.  After a thorough review of the record and relevant case law, however, the issues become more muddled.  It is apparent from the appellant's testimony, as supported by his doctors, that he already wakes up every morning between 4:00 and 5:00 a.m. and that the level of pain and stiffness he will face on a given morning is unpredictable.  Furthermore, there is little evidence in the record that a regular and predictable schedule is an essential

---

[3] We may not be convinced that the appellant's severe arthritis is a disability under the ADA, but for purposes of reviewing summary judgment, there is sufficient evidence that his condition "substantially limits" major life activities.  29 C.F.R. § 1630.2(g)

function of Ward's data entry position, or alternatively, that his requested accommodation -- an open-ended schedule -- would be an undue burden on his employer.  For these reasons, as discussed more fully below, we must reverse the opinion of the district court.[4]

### A.  Qualified Individual

It is Ward's position that he can perform the essential functions of his job with the reasonable accommodation of a flexible schedule.  MHRI argues that maintaining a predictable and regular schedule is an essential function of his job, and that because the record clearly shows that Ward cannot perform this function with or without reasonable accommodation, he is not a qualified individual under the ADA.

Our inquiry is somewhat complicated by the interrelationship between the terms "essential function" and "reasonable accommodation."  See Carr v. Reno 23 F.3d 525, 529 (D.C. Cir. 1994) (discussing the connection between both concepts in Rehabilitation Act case).[5]  The examination of an employee's "qualified" status requires consideration of available reasonable accommodations.  The analysis is generally

---

[4]  We need not reach the appellant's additional theory that the appellee's failure to engage in the interactive process provided an independent basis for his ADA claim.

[5] For our purposes, the standards applied in the Rehabilitation Act of 1973 are identical to those of the ADA.  See Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 513 n.7 (1st Cir. 1996) (citing 29 C.F.R. § 1630.1, app. (1995)).

broken into two steps: (1) whether the employee could perform the essential functions of the job; (2) if not, whether any reasonable accommodation by the employer would enable him to perform those functions. See White v. Stone, 45 F.3d 357, 361 (10th Cir. 1995) (citing cases); Tyndall v. National Educ. Ctrs. Inc. of California, 31 F.3d 209, 213 (4th Cir. 1994) (citing Chandler v. City of Dallas, 2 F.3d 1385, 1393-94 (5th Cir. 1993)).

Particularly with attendance cases -- as opposed to a simpler case where, for instance, a disabled employee needs to sit rather than stand to perform the essential functions of a job -- it is difficult to separate the analysis in this manner, and as a result courts vary in their treatment of attendance problems in the ADA context. Some courts focus on whether a fixed schedule is an essential requirement for the specific job and end the analysis there. See, e.g., Laurin v. Providence Hosp., 150 F.3d 52, 59-61 (1st Cir. 1998); Tyndall, 31 F.3d at 213-14; cf. EEOC v. AIC Sec. Investigation, Ltd., 820 F. Supp. 1060, 1063-64 (N.D. Ill. 1993) (denying summary judgment due to questions of fact whether regular attendance is essential function of job). Some courts conclude that a fixed schedule is essential but move on to consider whether there is an effective reasonable accommodation. See, e.g., Jacques, 96 F.3d at 512; Carr, 23 F.3d at 529; Wojciechowski v. Emergency Technical Servs. Corp., 1997 WL 164004, *2-*4 (N.D. Ill.); Aquinas v. Federal Express Corp., 940 F. Supp. 73, 79 (S.D.N.Y. 1996);

<u>Fritz</u> v. <u>Mascotech Automotive Sys. Group, Inc.</u>, 914 F. Supp. 1481, 1488-90 (E.D. Mich. 1996); <u>Vorhies</u> v. <u>Pioneer Mfg. Co.</u>, 906 F. Supp. 578, 581-82 (D. Colo. 1995); <u>Hendry</u> v. <u>GTE North, Inc.</u>, 896 F. Supp. 816, 825-27 (N.D. Ind. 1995); <u>Barfield</u> v. <u>Bell South Telecomms., Inc.</u>, 886 F. Supp. 1321, 1325-27 (S.D. Miss. 1995). And others confine the attendance issue to whether a modified schedule is a reasonable accommodation to perform the essential functions of the job. <u>See</u>, <u>e.g.</u>, <u>Heise</u> v. <u>Genuine Parts Co.</u>, 900 F. Supp. 1137, 1153-54 (D. Minn. 1995); <u>Dutton</u> v. <u>Johnson County Bd. of County Comm'rs</u>, 859 F. Supp. 498, 506-09 (D. Kan. 1994); <u>Kennedy</u> v. <u>Applause, Inc.</u>, 1994 WL 740765, *6-*7 (C.D. Cal. 1994), <u>aff'd</u>, 90 F.3d 1477 (9th Cir. 1996); <u>Guice-Mills</u> v. <u>Derwinski</u>, 772 F. Supp. 188, 199 (S.D.N.Y. 1991).

Rather than select one approach, we proceed by considering first whether attendance is an essential function of Ward's position, and second, if it is not an essential function, is a modified schedule a reasonable accommodation that will allow Ward to perform the essential functions of his job.

### 1.  Essential Function

An essential function is a "fundamental job dut[y]" of the employment position the individual with a disability holds or desires. <u>Laurin</u>, 150 F.3d at 56-57.  The term does not include "marginal functions of the position," but at the same time it "may be more encompassing than such core job requirements as an employee's technical

skills and experience even including such individual or idiosyncratic characteristics as scheduling flexibility." Id. at 57, 59 n.6 (internal citations omitted).

The district court deferred to MHRI's judgment that "regular and timely attendance during prescribed work hours" is an essential function of Ward's job. In doing so, the court noted that MHRI enforces its attendance policy for all of its employees. But that fact alone does not invariably lead to a conclusion that regular and reliable attendance is an essential function of every position at MHRI. While we generally give substantial weight to the employer's view of job requirements in the absence of evidence of discriminatory animus, see Laurin, 150 F.3d at 57-61; EEOC v. Amego, Inc., 110 F.3d 135, 144-45 (1st Cir. 1997), it is only one factor in the analysis. EEOC interpretive regulations indicate additional fact-intensive considerations, including among others: written job descriptions, consequences of not requiring the function, work experience of past incumbents, and work experience of current incumbents. See 29 C.F.R. § 1630.2(n)(3); Laurin, 150 F.3d at 56-57. Unfortunately, the applicable factors do not shed much light on whether a regular and predictable schedule is an essential function of a data entry clerk. Attendance is not specific to any factor but presumably applies to and affects each of them.

Granted, a regular and reliable schedule may be an essential element of most jobs.  See Tyndall, 31 F.3d at 213 (citing cases); Carr, 23 F.3d at 530.  However, as indicated below, resolution of the issue in each case requires a fact-intensive inquiry into the pattern of the attendance problem and the characteristics of the job in question.  And the defendant, who has better access to the relevant evidence, should bear the burden of proving that a given job function is an essential function.  See Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1113 (8th Cir. 1995); Monette v. EDS Corp., 90 F.3d 1173, 1182 n.8, 1184 (6th Cir. 1996) (discussing 42 U.S.C. § 12112(b)(6)); cf. Stone v. City of Mount Vernon, 118 F.3d 92, 99-100 (2d Cir. 1997) (reversing because there was insufficient evidence to support claimed essential function), cert. denied, 522 U.S. 1112 (1998); White, 45 F.3d at 362 (examining employer's evidence in support of position's essential functions).

We find nothing in the record to support the appellee's position that a set schedule is an essential requirement for Ward's job.  MHRI insists that Ward requires supervision and that, therefore, arrival by 9:00 a.m. is essential.  This determination is apparently based on performance evaluations that suggest that Ward has performed poorly, in addition to his tardiness problem.  However, the appellee does not contend that Ward was terminated for poor performance, only for recurring tardiness.  And Ward challenges the accuracy of his

-13-

latest performance review, claiming that he was given no opportunity, as per normal MHRI policy, to respond to the evaluation. Thus, there is some dispute as to whether Ward's performance was, in fact, deficient, and that dispute undermines MHRI's sole explanation for its judgment that a regular and reliable schedule is an essential requirement of Ward's position. Moreover, the existence of a flexible schedule that permits Ward to work from 7:00 a.m. - 3:00 p.m. or 9:00 a.m. - 5:00 p.m., regardless of his supervisor's schedule, creates the obvious impression that MHRI is not bothered by some periods of unsupervised work. We must infer that there is a genuine dispute of fact over Ward's need for constant supervision.

What is noticeably absent from the record is any evidence that the nature of Ward's position requires that he be present during specific hours of the day. In fact, the record suggests otherwise. Ward has no duties other than data entry and his work is only time-sensitive in that it must be completed before the laboratory opens the next day. And other than the disputed issue of supervision, MHRI did not suggest that it is essential that Ward's work schedule significantly overlap with other lab employees -- e.g. for transfers of information or to meet time-sensitive deadlines. Based on this record, a reasonable factfinder could conclude that a regular and predictable schedule is not an essential function of Ward's position so long as he works the requisite 7.5 hours per day. Compare Laurin, 150 F.3d at 59-

-14-

61 (considering "exceptional" scheduling demands upon 24-hour hospital maternity unit and general undesirability of night shifts in concluding that shift flexibility is essential function); Tyndall, 31 F.3d at 213-14 (observing that teaching position requires regular presence on campus to teach assigned courses during scheduled class times); Wojciechowski, 1997 WL 164004 at *2-*3 (considering that salesperson position requires daily contact with customers, cold calls, and secondary functions of back-up on incoming sales calls, daily mail, and daily environmental cleanup proposal preparation); Aquinas, 940 F. Supp. at 79 (accepting Fed Ex strict attendance policy due to time-sensitive nature of job); Fritz, 914 F. Supp. at 1489 (observing that in addition to evidence of enforcement of punctuality policy, defendant pointed to "the shortage of computer equipment and the need to occasionally consult with and supervise Plaintiff as he performed his work"); Vorhies, 906 F. Supp. at 581 (observing employer's testimony that plaintiff had unique duties which had to be performed daily); Heise v. Genuine Parts Co., 900 F. Supp. 1137, 1152-53 (D. Minn. 1995) (considering whether daily customer contact is essential function of salesperson); Hendry, 896 F. Supp. at 825 (concluding that service clerk position required four basic functions to be performed daily); Barfield, 886 F. Supp. at 1326 (observing that sales representative has daily duties such as handling customers' complaints and inquiries); AIC Sec. Investigation, Ltd., 820 F. Supp. at 1063-64 (denying summary

judgment due to question of fact whether Executive Director position had heavy day-to-day demands that were affected by absence).

### 2. Reasonable Accommodation

A reasonable accommodation "enable[s] a qualified individual with a disability to perform the essential functions of [his] position." See 29 C.F.R. § 1630.2(o)(ii). Ward contends that with the reasonable accommodation of an open schedule, he could perform the essential functions of his job – 7.5 hours of data entry.

We decline to hold that the flexible schedule Ward proposes is per se unreasonable.[6] The ADA explicitly states that "job

---

[6] Contrary to MHRI's assertion that "numerous courts have held that, as a matter of law, open-ended 'work when able' schedules are not reasonable accommodations," Appellee's Brief at 34, the referenced courts all engage in some level of factual inquiry into the specific accommodation and the burden on the employer. See Carr, 23 F.3d at 529 (relying on the specific nature of the position and employer in concluding that requested accommodation would impose undue hardship); Kimbro v. Atlantic Richfield Co., 889 F.2d 869, 878 & n.8 (9th Cir. 1989) (finding "clear support in the record" for determination that an open ended schedule "would have imposed an undue hardship" based on valid safety concerns for an individual machinist working alone after hours); Kennedy, 1994 WL 740765 at *7 (holding that plaintiff failed to show she could perform the essential functions of her job with the requested accommodation and that the requested accommodation to work 10 hours one day and 2 hours the next as her condition permitted was unreasonable as a matter of law); Smartt v. Charlotte Housing Auth., 1998 WL 760866, *3-*4 (W.D.N.C. 1998) (observing that the medical evidence refuted need for requested accommodation); Palazzolo v. Galen Hosps. of Texas, Inc., 1997 WL 837951, *3-*4 (N.D. Ga. 1997) (observing that accommodation would require restructuring the closing chef position before concluding that open schedule is unreasonable); Hypes v. First Commerce Corp., 3 F. Supp. 2d 712, 719 (E.D. La. 1996) (holding that "[an open ended schedule] hardly seems a reasonable accommodation in this case," where the plaintiff's work affects the schedule and efficiency of others in his department.).

restructuring" and "part-time or modified work schedules" are potential reasonable accommodations. 42 U.S.C. § 12111(9); Criado, 145 F.3d at 441, 443 (citing statute). Nothing in that explicit language implies that a modified schedule must be regular or predictable. But see Kennedy, 1994 WL 740765 at *6 (citing Walders v. Garrett, 765 F. Supp. 303, 314 (E.D. Va. 1991)).

Therefore, MHRI must submit some evidence in support of its position that the requested accommodation would impose undue hardship. See 42 U.S.C. § 12112(b)(5)(A); Stone v. City of Mt. Vernon, 118 F.3d 92, 97 (2d Cir. 1997) (in practice "show[ing] that the accommodation is not reasonable, or that it imposes an undue hardship" "'amounts[] to the same thing'" (quoting Borkowski, 63 F.3d at 138)); Monette, 90 F.3d at 1183; Benson, 62 F.3d at 1112; White, 45 F.3d at 361. However, rather than produce evidence that a flexible schedule would present "significant difficulty or expense," 29 C.F.R. § 1630.2(p)(1), MHRI has offered only general statements regarding the snowball effect of such an accommodation – it would eliminate employers' control over the workplace and ability to maintain any standards. Such an argument runs counter to the general principle behind the ADA that imposes a duty on the employer to modify some work rules, facilities, terms, or conditions to enable a disabled person to work, and if MHRI's position were given credence, it would defeat almost any reasonable accommodation.

-17-

Instead, to meet its burden, MHRI needs to produce at least some modicum of evidence showing that an open-ended schedule would be a hardship, financial or otherwise.  See 29 C.F.R. § 1630.2(p)[7]; e.g., Soto-Ocasio v. Federal Express Corp., 150 F.3d 14, 20 (1st Cir. 1998) (recognizing that requested accommodation would require that employer reallocate other employees to complete appellant's data entry work -- 6-9 hours' worth of work per day -- to ensure that her deadlines were met); Carr, 23 F.3d at 529 (concluding that "[t]he U.S. Attorney's

---

[7]  The regulations provide the following factors to be considered:

> (i) The nature and net cost of the accommodation needed under this part, taking into consideration the availability of tax credits and deductions, and/or outside funding;

> (ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;

> (iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;

> (iv) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and

> (v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

29 C.F.R. § 1630.2(p).

-18-

Office 4:00 p.m. deadline renders a flexible schedule an undue hardship" because others would have to do plaintiff's work on a regular basis); Guice-Mills, 772 F. Supp. at 199 (reasoning that requested accommodation of 10:00 a.m. start time for Head Nurse was unreasonable burden on hospital because her duties would have to be reassigned). For example, MHRI could have introduced evidence that in order to accommodate Ward, it would need to keep the laboratory open indefinitely at significant cost (extra hours for security personnel or janitorial staff) or that his duties would need to be subsumed by a co-worker. MHRI has only suggested that it would be a burden to require Ward's supervisor to match his schedule, but as discussed above, there is a factual dispute over Ward's need for constant supervision to perform the essential functions of his job.

### B. Discharged Because of Disability

Because we also find that there is a genuine dispute as to whether Ward's tardiness was caused by his disability, we must reverse the district court's decision. It is undisputed that Ward informed his employer that he had a disability prior to his termination through the new employment application and his conversation with Leonard. The medical evidence unequivocally establishes that Ward suffers from severe arthritis "characterized by marked increase in symptoms of pain and stiffness after periods of immobilization" such as sleeping. App. at 104 (letter of Dr. Jeffrey R. Wohlgethan, May 13, 1998). Symptoms

-19-

are "most evident in the morning" and stiffness can last up to several hours.  Id.  The pain also interferes with his ability to sleep to such an extent that he estimates that he averages about two hours of sleep per night.  See id. at 195.  Although one of his doctors recommended that he make an effort to go to bed earlier and to take naps, see id. at 90, that same doctor later stated that he could draw no conclusion that altering sleep habits would enable Ward to arrive at work on time, see id. at 741.  According to Ward's testimony regarding his daily ritual, he always showers at night, usually retires to bed around 10:00 p.m. and arises between 4-5:00 a.m.  Before he can get out of bed, he must use a blow dryer to heat his legs for 15 - 45 minutes until he can move.  And when he is ready, with much difficulty he makes his way down three flights of stairs, which requires several breaks.  See id. at 195-97.  As his doctor explained, "if he picked an early enough time" to cover the maximum delay, it "might be so early that he would have to go to bed at three in the afternoon."  Id. at 159.

The district court, relying on Amego, 110 F.3d at 149, and Leary v. Dalton, 58 F.3d 748, 753 (1st Cir. 1995), concluded that even if the appellant "was fired 'because of' his tardiness, it does not follow that he was fired 'because of' the arthritis." Opinion at 13. However, the facts of this case clearly do not support an instance of the but/for reasoning this circuit criticized in those cases.  In Amego, the appellant was terminated because she could not be trusted to

-20-

handle the medical-related functions of her job -- overseeing and administering medication -- due to her attempted suicide through medication overdose.  See Amego, 110 F.3d at 144.  The employee was terminated because of the method of attempted suicide, which does not flow directly from her depression.  See id. at 149.  Similarly in Leary, we upheld summary judgment against an employee who was terminated for misconduct that resulted from his alcoholism.  See Leary, 58 F.3d at 753-54.  In contrast, there is arguably a conduct connection in Ward's case -- the tardiness flows directly from the arthritis -- and therefore, a finding against him on this element was improper.

## IV.  CONCLUSION

Because there exist genuine disputes of material facts as to the appellant's performance and whether he was discharged because of his disability, and because MHRI has not established that it is entitled to judgment as a matter of law, we **reverse and remand** for proceedings consistent with this opinion.  Of course, at trial, MHRI is entitled to present evidence to rebut evidence that Ward has either submitted or will submit relating to each of the issues discussed herein.