Brassard, J.
The plaintiff in this action has brought suit pursuant to G.L.c. 15IB alleging that her former employer failed to reasonably accommodate her disabilities and retaliated against her for requesting such accommodations. The defendants now move for summary judgment contending that the plaintiff is not a qualified handicapped person within the meaning of the statute, that they have provided reasonable accommodations, and that the plaintiff has failed to establish a retaliation claim. After a hearing and careful review of the papers, the defendants’ motion for summary judgment is ALLOWED in part and DENIED in part.
BACKGROUND
The facts, taken in the light most favorable to the plaintiff, are as follows.
Plaintiff Doreen Smith (“Smith”) contracted polio in 1955 when she was two years of age, and as a result, requires a motorized scooter for mobility. In 1978, Smith began her employment with defendant Bell Atlantic (“Bell Atlantic”).[2] On December 18, 1992, *398 Smith, who was working in Bell Atlantic’s Waltham office, but attending weekly meetings at Bell Atlantic’s Marlborough office, wrote to Human Resources Staff Director Jack Cooney (“Cooney”) and requested that the handicapped parking spaces at the Marlborough office be widened to accommodate her specially equipped van which she used to transport her motorized scooter. Defendant Robert Olson (“Olson”), the Director of Bell Atlantic’s Planning Department, subsequently designated the oversized handicapped parking space at the Marlborough facility as “van parking only.”
The Marlborough Transfer
In May. 1993, as part of a departmental reorganization, Bell Atlantic transferred Smith from Waltham to Marlborough, and classified her as “Second-level Manager." Her responsibilities in that capacity included data analysis, report preparation and summarization, and internal consultation to less experienced employees. Smith claims that despite her objections, Bell Atlantic made the decision to transfer her with total disregard for how it might impact her physical condition.
At Marlborough, Olson supervised Smith. In order to accommodate Smith, Olson rearranged the office space in his department so that she would not have to maneuver around too many corners on her scooter to get to her work space. Olson also asked Smith whether she needed the restroom doors to be equipped with electric door openers. Smith told Olson that such openers would not be necessary.
Despite obtaining sufficient accommodations in the office, Smith contends that her supervisors failed to address her complaints regarding the lack of large parking spaces sufficient to accommodate her van.[3] Specifically, Smith asserts that Olson ignored her repeated complaints that she could not find any handicapped parking, that available spaces were not of sufficient size to accommodate her van, and that on several occasions, the night security guard blocked her van. According to Smith, Olson told her that she was making too much of the situation, and did nothing to rectify it.
On June 21, 1993, Smith took leave under Bell Atlantic’s disability plan to have knee-replacement surgery. Following her surgery, Smith made arrangements with Olson to work three half-days per week at home as she transitioned back to work full-time. Smith alleges, however, that Olson persisted in leaving her work-related notes in the Marlborough office, thus making it impossible for Smith to effectively work from home.
Moreover, although Olson provided Smith with a laptop- computer equipped with modem to access Bell Atlantic’s computer system from home, Smith contends that Bell Atlantic failed to supply her with sufficient equipment to operate her home office effectively. Specifically, Smith alleges that the computer support personnel refused to help her operate the equipment, and that when she complained to her supervisors, they instructed her to handle the problem herself. Smith further contends that she did not have access to intra-company communications because Bell Atlantic did not install Lotus Notes in the computer. According to Smith, even though Bell Atlantic was aware of the problem, it continued to send her numerous assignments via Lotus and penalized her for failing to complete such assignments by relieving her of certain job responsibilities.
On June 24, 1994, Smith returned to work full-time. According to Smith, Olson agreed that she would not have to do any significant traveling because of her physical limitations. Shortly thereafter, however, Olson placed Smith on “special assignment” status-which required frequent travel to offices located in Waltham, Cambridge, Boston, Framingham, Marlborough, Quincy, Providence, Rhode Island, and Manchester, New Hampshire.
On June 30, 1994, Smith’s orthopedic surgeon, David W. Lhowe (“Dr. Lhowe”), informed Bell Atlantic’s Medical Director that Smith told him a one-hour commute to and from work was beyond her tolerance. Moreover, Dr. Lhowe opined that Smith could perform more of her work duties if Bell Atlantic decreased her commute or allowed her to work at home some of the time. On July 6, 1994, Smith wrote to Olson stating that she was finding it difficult to maintain her work schedule at her present location. She specifically requested: (1) a change in assignment to a management position closer to her home in Dedham; (2) an accessible work location; and (3) a modified work schedule permitting her to work both at home and in the office, with installation of office equipment in her home. According to Smith, Olson took no formal action.
Thereafter, Smith and Olson explored the possibility of reassignment to a different work location. Olson spoke to George Haines (“Haines”),[4] the Director of Outside Plant Construction and Engineering in Waltham, and asked Haines about the availabilify of positions in his department. Haines subsequently interviewed Smith, but chose not hire her for a position. Smith also applied for an unspecified staff director’s position that was ultimately cancelled. Smith contends that Olson refused to assist her in finding a comparable job within Bell Atlantic and that another director’s interest in hiring Smith evaporated after speaking with Olson.
Between January 18, 1995 and April 6, 1995, Smith could not work and collected benefits under Bell Atlantic’s disability plan. During that time, Olson visited Smith in her home and spoke with her about what could be done to facilitate her return to work. When Smith returned, she was under doctor’s orders to limit her work to sedentary functions. Specifically, Smith could not bend, squat, climb, lift more than ten pounds, walk more than ten feet, reach above chair *399 height, or engage in repetitive arm/hand motion for more than thirty minutes without a break. Moreover, Smith required handicapped accessible parking.
Within a week of Smith’s return, she met with Olson to discuss relocating to a different office to reduce the length of her commute. Smith told Olson that Bell Atlantic offices in Boston, Waltham, Burlington, and Roslindale would be satisfactory.
The Boston Transfer
Some time between April and June 1995, Smith relocated to an office'in Bell Atlantic’s facility at 125 High Street in Boston. Handicapped spaces were available in the parking garage located under the High Street Building and in the Post Office Square public parking garage. Smith was unable to utilize any of these parking options, however, because they did not accommodate her large van. As a result, Smith was forced to park her van in the handicapped parking spaces located on the street in the rear of the building, or on Franklin Street or State Street.
On June 6, 1995, while walking from her van to her office, Smith tripped and sprained her right ankle. Smith received workers’ compensation benefits and remained out of work until July 24, 1995, when she returned on a half-day basis until October 12, 1995. Shortly thereafter on December 4, 1995, Smith filed a complaint with the Massachusetts Commission Against Discrimination.
In 1996, Dr. Julie K. Silver, M.D. (“Dr. Silver”) •diagnosed Smith with “Post-Polio Syndrome” (“PPS”), causing weakness, fatigue, pain and difficulty swallowing and breathing. In February 1996, Smith underwent shoulder surgery and was again paid under Bell Atlantic’s disability policy. On January 2, 1997, Smith returned to work on a half-day basis. By that time, Roberta Swanson-Hook (“Swanson-Hook”) replaced Olson as Smith’s manager. During a telephone conversation prior to her return, and again on the day she returned, Smith discussed her need for accommodation with Swanson-Hook. Specifically, Smith asked that she be allowed to begin her work day at 7:00 a.m. in order to find suitable handicapped parking in Boston. Smith also asked that her home office needs be reviewed. On or about March 27, 1997, Swanson-Hook authorized the installation of two additional telephone lines in Smith’s home for computer and fax access and allowed Smith to begin her workday at 7:00 a.m.
The Re-transfer to Marlborough
Shortly after January 1998, William Haid (“Haid”) replaced Swanson-Hook as Smith’s manager, and Bell Atlantic relocated Smith from the Boston office back to Marlborough. Haid asked Smith to establish whatever data-links were required to allow her to work from home and to provide him with the required information. He also limited Smith’s travel, and allowed her to participate in department meetings via conference call. According to Smith, Haid frequently scheduled meetings and failed to conference Smith, or asked her to participate in meetings, and then made it difficult or impossible for her to call. Haid also pressured Smith to travel and to attend multiple-day conferences at hotels and other facilities that were not handicap accessible.
On January 23, 1998, Smith faxed a doctor’s note to Sue Szyanl, Haid’s executive assistant, stating that her restricted duty status was to be extended. On October 6, 1999, Dr. Silver again wrote to Bell Atlantic stating that Smith was having “a lot of trouble with mobility,” and recommended that she work from home and not commute. By Fall 1999, Smith stopped working entirely. She underwent additional surgery in April 2000, and has been unable to work since. On June 7, 2000, Smith’s short-term disability benefits expired, and Bell Atlantic switched her to its long-term disability plan.
According to Smith, Bell Atlantic’s failures to provide reasonable accommodations have rendered her unable to work, totally disabled, and will ultimately result in her being confined to a nursing home within 10 years. On June 5, 1998, Smith filed suit against Bell Atlantic, NYNEX and Olson (collectively, “Bell Atlantic”) alleging handicap discrimination and retaliatory discharge in violation of G.L.c. 15 IB. Bell Atlantic filed the present motion for summary judgment on May 1, 2001.
DISCUSSION
This court grants summary judgment where there are no genuine issues of material fact and where the moving party is entitled to judgment as a matter of law. Cassesso v. Comm'r of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. See Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). The materials presented by the moving party need not negate or disprove every essential element of the claim of the party on whom the burden of proof at trial will rest, but they must demonstrate that there is no reasonable expectation that proof of the elements will be forthcoming at trial. See Kourouvacilis v. General Motor Corp., 410 Mass. 706, 711-16 (1991).
Discrimination on the Basis of Handicap
In a case alleging unlawful discrimination on the basis of handicap, the burden rests with the plaintiff to establish that she is a handicapped person; that, in spite of her handicap she is qualified for the position from which she was fired; and that she was fired solely because of her handicap.[5] See Garrity v. United Airlines, Inc., 421 Mass. 55, 60 (1995). Under G.L.c. 15IB, §4(16), it is unlawful:
For any employer . . . to . . . discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of per *400 forming the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer’s business.
General Laws c. 151B, §1(16) defines a “qualified handicapped person” as:
A handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap.
In this case, Smith maintains that she is a “qualified handicapped person” because she consistently performed the essential elements of her job on a regular basis. According to Bell Atlantic, however, Smith’s “chronic and continuing unavailability for work” and her inability to travel rendered her incapable of performing her previous job even with reasonable accommodations. The issue thus becomes whether regular attendance and travel were essential functions of Smith’s job.
Essential functions of a job are those activities which must necessarily be performed by an employee to accomplish the principal objects of the job. See Guidelines: Employment Discrimination on the Basis of Handicap, Chapter 15IB, 8 Mass. Discrimination L. Rep. 2004, 2008 (1986). Whether a certain function is an essential function is not based solely on the employer’s judgment. See Labonte v. Wheeler, 424 Mass. 813, 822-3 (1997); see also Ward v. Massachusetts Health Research Institute, 209 F.3d 29, 34 (2000); Pandazides v. Virginia Bd. of Educ., 946 F.2d 345, 349 (4th Cir. 1991) (employer may not make a function essential merely by claiming that it is). Rather, the employer’s judgment is considered against other factors including written job descriptions, the consequences of not requiring the function, work experience of past incumbents in the same or similar jobs, and work experience of current incumbents. See Labonte, 424 Mass. at 821; Ward, 209 F.3d at 34; see also 29 C.F.R. §1630.2(n) (1999).[6]
Determining the essential functions of a job in an employment discrimination action requires an appropriate finding of facts. See Cox v. New England Telephone & Telegraph Co., 414 Mass. 375, 383 (1993). Thus, in Labonte v. Hutchins & Wheeler, 424 Mass. 813, 821 (1997), the Supreme Judicial Court held that it was for the jury to determine the essential functions of the employee’s position as an “executive director.” In that case, the employer did not offer into evidence an official job description for the employee’s position, and conceded that each person who had been in a similar position had performed slightly different functions depending on the employer’s needs at that particular time. Id. at 821. On these facts, the Court stated:
The [employer] claims that whether a certain function is an “essential function” is solely the employer’s judgment. That judgment is tested by relevant guidelines such as the work experience of previous incumbents and the current work experience of incumbents in the same or similar jobs.
Id. at 821. Similarly, in Cox v. New England Telephone & Telegraph Co., 414 Mass. 375, 387-89 (1993), the Court deferred to the trial judge’s determination of the witness’ credibility and affirmed his factual finding that pole climbing was an essential element of a splice service technician position.
Along these lines, the First Circuit recently held that a determination of whether regular,, reliable attendance is an essential element of a job requires “a fact-intensive inquiry into the pattern of the attendance problem and the characteristics of the job in question.” See Ward, 209 F.3d at 35. In Ward, an employer argued that because the employee’s handicap made a set schedule difficult, the employee could not perform an essential element of the job, and was thus not a qualified handicapped person entitled to either the ADA’s or c. 15 IB’s protection. Because nothing in the summary judgment record indicated that the nature of the employee’s position required him to be present during specific hours of the day, the Court held that the employer’s failure to prove that a regular and predictable job schedule was essential precluded summary judgment. Id. at 35.
Applying these principles to the case at bar, the court finds that Bell Atlantic has not put forth sufficient Rule 56 evidence to support its contention that attendance was an essential function of Smith’s job. Bell Atlantic has not submitted any official description of Smith’s position, and therefore, there is no clearly defined list of essential functions that Smith must prove she could perform. See Labonte, 424 Mass. at 822. Although Olson testified in his deposition that “[t]he normal hours of operation of our business were 8:30 to 5:00 work hours,” he also stated that he “did not keep track of where [Smith] was at what time of the day.” He further testified:
Q: . . . You really don’t care where [Smith] does her job as long as her job gets done in a cost-effective manner; is that fair to say?
A: Basically, yes.
Nothing in Smith’s interrogatory answers describing the requirements of the various managerial positions she held over the course of her 20-year employment suggests that Bell Atlantic ever required her to regularly report to work at a Bell Atlantic office. To the contrary, the record indicates that beginning in 1994, Bell Atlantic allowed Smith to work, in part, at home. Smith describes her managerial position from 1997-1999:
Independently attempted to establish a simulated work office in her home with the exception of 2 *401 POTS lines provided by the company: obtain office equipment . . . investigate and implement access ... to various Bell Atlantic Systems ... for analysis in the development of various reports . . . and to respond to various Staff requests from my home office.
Additionally, Haid states in his affidavit that:
At or near the outset of my supervision with Smith, I met with her and made a work arrangement which allowed Smith to work largely from her home rather than a Bell Atlantic Office site ... I suggested that she become an expert on telecommuting as a resource for the company.
Nor has Bell Atlantic put forth any evidence indicating that other persons employed in Smith’s position were required to report to work at a Bell Atlantic office daily. Although Haid testified that Bell Atlantic’s allowing Smith to participate in meetings via conference call “was not the standard practice at the Company,” Bell Atlantic has not submitted affidavits or depositions of similarly situated employees.[7]
Bell Atlantic relies heavily on Picot v. New England Telephone & Telegraph, 1994 WL 878936, 3 Mass. L. Rptr. 80 (Sup. Ct. 1994) (Flannery, J.), to support its contention that attendance was an essential function of Smith’s employment. In Picot, an employee who was injured at work and subsequently absent from work 70% of the time over a five-year period sued her employer for violating c. 15IB following her termination. Id. at *3. The summary judgment record indicated that at the time of her dismissal, the employee had previously been warned three times about her excessive absenteeism and was a member of a union whose collective bargaining agreement with the employer considered good and regular attendance to be an essential function of her job. Id. Moreover, the employer offered evidence that the employee’s frequent absences resulted in high costs. Id. On these facts, the court held that “a regular and reliable level of attendance is a necessary element of most jobs.” Id. at *2.
In contrast to the extensive summary judgment record in Picot, in the present case, Bell Atlantic has submitted no evidence indicating that Smith had formal notice that her job was in jeopardy, nor has it submitted materials evidencing that Smith’s absences caused Bell Atlantic to suffer financially.[8] Instead, Bell Atlantic relies solely on Smith’s lengthy medical absences, for which it provided disability compensation and apparently had notice, to support its contention that daily office attendance is an essential function of Smith’s former job. That argument misses the mark. While Smith’s lengthy absences may indeed become a significant factor in determining whether she was able to perform the essential function of regular attendance, it must first be determined that regular attendance was an essential element of her position.
Bell Atlantic also argues that Smith is not a qualified handicapped person because she cannot perform the essential job function of traveling. According to Bell Atlantic, testimony Smith gave during her deposition to the effect that she was required to be at various company sites while on “special assignment” is conclusive evidence that traveling among offices is an essential job function. Smith, however, states in her affidavit:
Contrary to what I understand the defendants have said, travel was not an essential element of my job. Even to the extent that some travel may legitimately have been required of me, I did not become incapable of undertaking such travel until after the defendants’ improper conduct caused my physical condition to deteriorate. Moreover, while I did undertake a lot of traveling at [Bell Atlantic’s] insistence, often such travel was not truly necessary.
Viewing the evidence in the light most favorable to Smith, a reasonable jury may find that over the course of her employment with Bell Atlantic, Smith held various managerial positions with different requirements. According to the record, as Planning Manager in 1993, Bell Atlantic required Smith to travel from the Waltham office to the Marlborough office for weekly staff meetings. Thereafter, Smith’s “special assignment” as a Second Level Planning Manager required her to travel more frequently and to more offices at least until February of 1996. In the later years of her employment, however, as discussed above, Smith worked, in part, from home.[9] Because a genuine dispute of material fact remains as to whether regular attendance and travel were essential elements of Smith’s job, summary judgment as to Smith’s c. 151B claim is DENIED.
Retaliatory Discharge
To recover on a retaliatory discharge claim under c. 15 IB, Smith must establish that (1) she engaged in a protected activity by filing a complaint, testifying or assisting in an MCAD or court proceeding; (2) Bell Atlantic was aware of that protected activity; (2) Bell Atlantic thereafter took an adverse employment action against her; and (4) but for Smith’s activity, Bell Atlantic would not have taken the adverse employment action against her. See MacCormack v. Boston Edison, Co., 423 Mass. 652, 662-63 (1996). “In presenting a case of retaliation, a plaintiff must produce evidence, that if believed, would entitle him to judgment.” Id. at 663.
In support of her retaliation claim, Smith argues that after she charged Bell Atlantic with discrimination at the MCAD, Bell Atlantic retaliated against her by not considering her for job opportunities for which she was qualified. Smith testified at her- deposition:
Q: What are the factual bases for that [retaliation] claim . . .?
*402 A: I feel that the company had it within their power to find a position because there were several others that weren’t posted, especially over the long term of this period where the accommodation was not met, that they could have helped or assisted in finding another position that met the criteria.
According to the record, however, the job opportunities Smith allegedly inquired into were available around July 1994. Additionally, Smith spoke with Olson about assisting her in finding other employment positions within the company around July 1994 and/or late ‘94, ‘95. Specifically, Smith testified at her deposition:
Q: When did you contact George Haines?
A: I would say, I don’t know, June, July. Summer of ‘94. I don’t recall exactly.
Q: What was the position that was available?
A: He had several positions open . . .
Q: Did you tell Mr. Olson that?
A: Yes.
Q: What did he say, if anything?
A: I think he said he’d look into it.
Additionally, Olson stated at his deposition:
Q: How many times did you talk to Mr. Griffen about positions for [Smith]?
A: I think the initial one, and then the follow-up one when he didn’t have anything available.
Q: . . . Was it the time between ‘93 or ‘94?
A: Yeah, late ‘94, ‘95.
Smith, however, did not file her charge with the MCAD until December 5, 1995.
Thus, because the adverse employment actions about which Smith complains occurred prior to her MCAD complaint, Smith fails to present sufficient evidence to establish a prima facie case of retaliation. Summary judgment as to Smith’s c. 15IB claim alleging retaliatory discharge is, therefore, ALLOWED.[10]
ORDER
For the foregoing reasons, the defendants’ motion for summary judgment as to plaintiffs c. 15 IB alleging discrimination is DENIED. The defendants’ motion for summary judgment as to plaintiffs c. 15 IB claim alleging retaliatory discharge is ALLOWED.

 In 1997, NYNEX merged with Bell Atlantic and effectively became Smith’s employer.

 Specifically, Smith argues that she discussed her situation with the following persons on the following days:
Robert Olson: continually while he acted as her supervisor
Jack Cooney: 12/94, 1/95
Babe Kinder: 7/94
Ethics Hotline: 4/95
Ginger Rogers: left an unreturned voicemail sometime in 1999

 Also identified in the summary judgment record as George Haynes.

 There is no disagreement among the parties that Smith suffers from post-polio syndrome and is, therefore, handicapped. Thus, Smith satisfies the first prong.

 It is well settled that the Federal guidelines may guide Massachusetts courts in interpreting c. 151B. See Labonte, 424 Mass. 822 n. 14.

 Although Bell Atlantic’s assertionthat the permission it gave to Smith to work at home satisfies its obligations under c. 151Bmay be meritorious, that argument does not address whether attendance was in fact an essential job requirement.

 Although Smith herself makes reference to two instances in which Bell Atlantic allegedly indicated that her absences may result in termination, Bell Atlantic has not put forward any evidence indicating that Smith received formal notice from a management official authorized to provide such notice.

 Again, while Bell Atlantic’s assertion that it satisfied its obligations under c. 15IB by permitting Smith to work at home may be meritorious, that argument does not address whether traveling was in fact an essential job requirement.

 Assuming, without deciding, that merely requesting reasonable accommodations is a protected activity that satisfies the first prong of a retaliation claim, Smith has still failed to establish sufficient evidence of retaliatory discharge. Specifically, Smith has produced no evidence to show a causal connection between her requests for reasonable accommodation and her failure to be considered for vacant jobs within the company for which she is qualified. At most, the record indicates that Smith applied for jobs and was not hired, and that Olson was unsuccessful, on at least one occasion, at finding another job for her. Smith testified at her deposition:
Q: . . . Did you apply for a job in Waltham?
A: Yes, and I actually had an interview with Mr. Haines.
Q: Were you picked for the job?
A: No.
Q: Do you know why?
A: No.
Q: Did you apply for any other jobs?
A: Yes.
Q: Were you interviewed for that job?
A: No.
Q: Do you know why?
A: No.
Smith also stated:
Q: You mentioned the staff position job, when did you apply for that job? ... Do you know the year?
A: No.
Q: Did you have an interview?
A: Yes.
Q: Do you know why you did not get that job?
A: No.
Q: Are you claiming that you didn’t get that job because of your disability?
A: No.
Q: Are there any other jobs that you’re claiming that you didn't receive because of your disability?
A: No.
Additionally, Olson stated at his deposition:
Q: Can you tell me what you remember you said and Mr. Griffen said during those conversations?
*403 A: ... I had an employee [Smith] who was looking for an assignment outside of where we were working, maybe in the Boston area. “Do you have anything that you have in your shop that might be available, or would you know of anything around the area?”
Q: And do you remember what Mr. Griffen responded?
A: A couple, three days or so -"No, I don’t have anything available," and he wasn’t going to, and “I have asked around, and asked people to get back to me,” and there was nothing that came from that.
This evidence is not sufficient to make out a claim for a jury. See Lewis v. Gillette Co., 22 F.3d 22, 24 (1st Cir. 1994) (to avoid summary judgment on retaliatory discharge claim, non-moving party must make “showing sufficient to establish the existence of the elements essential to his case”).